Glenn Paul BAKER, Sr., Plaintiff-Appellee, Cross-Appellant,

v.

RAYMOND INTERNATIONAL, INC., Defendant-Appellant, Cross-Appellee.

No. 80–3019.

United States Court of Appeals, Fifth Circuit. Unit A

Sept. 14, 1981.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 2, 1981.

Deutsch, Kerrigan & Stiles, Ralph E. Smith, Eileen Madrid, New Orleans, La., for defendant-appellant, cross-appellee.

Henderson, Hanemann & Morris, Philip E. Henderson, Houma, La., for plaintiff-appellee, cross-appellant.

Before SKELTON[*], Senior Judge, and RUBIN and REAVLEY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The complex relationship between an American corporation and the affiliated Saudi Arabian corporation through which it transacts business in that country requires that we carefully examine whether the American corporation is responsible under the Jones Act and general maritime law for injuries to American seamen working on foreign waters.

Glenn Baker, an American seaman accidentally injured while working in the Persian Gulf, seeks to hold Raymond International, Inc. (Raymond), an American corporation, liable for his injuries even though, at the time of the accident, he was nominally employed by Raymond's affiliated Saudi Arabian corporation, Raymond Saudi Arabia, Ltd. (RSA). At trial, Baker based his claims on the theory that he was Raymond's borrowed seaman under the Jones Act; that because Raymond treated RSA as a mere instrumentality, the court should pierce RSA's corporate veil and regard Raymond as his employer under the Jones Act; and that Raymond should be held liable for furnishing RSA with the unseaworthy barge on which the accident occurred. Responding to special interrogatories,[1] the jury found for Baker on all three claims. Relying exclusively on the unseaworthiness of the barge, we affirm the award of compensatory damages. We reverse and remand for a new trial on the issue of liability for maintenance, cure, and wages to the end of the voyage, and we affirm the trial judge's alternative grant of a new trial on the American corporation's liability for damages for failure to pay these items. These apparently anomalous results are occasioned by the unusual manner in which the issues were framed and the case was tried. We now explain.

I.

Glenn Baker contended that the sole defendant, Raymond, was responsible for the

---

[*] Senior Judge of the United States Court of Claims, sitting by designation.

1. We have often commended submission of complex cases to juries on interrogatories. See Guidry v. Kem Mfg. Co., 598 F.2d 402, 405 (5th Cir.), cert. denied, 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1979); Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338 (1967).

injuries he sustained. In addition to defending on the merits, Raymond sought to show that Baker was employed by RSA, only 50% of whose stock was owned by Raymond, through a subsidiary, and that, if Baker was injured as a result of either negligence or unseaworthiness, Raymond itself was not liable.

Baker's trip to the Persian Gulf began when, unemployed after working in the North Sea, he responded to a Raymond newspaper advertisement in a New Orleans newspaper, the *Times Picayune*, offering marine construction workers employment in Saudi Arabia. The advertisement stated: "We are currently recruiting for a number of skilled craft personnel to work on our LPG pipeline trestle in the Arabian Gulf." Another Raymond advertisement stated: "Positions continue to open up on our construction work force now building a major piling trestle in the Arabian Gulf." Applicants were invited to send a resume to Manager, Foreign Recruiting, Raymond International, Inc. or to Gene La Grose or Herb Morgan at Raymond International, Inc., Houston, Texas. Instead of writing, Baker went to Raymond's office in Houston, where he was interviewed by a Raymond employee and accepted for employment.

After taking a physical examination, Baker signed an employment contract in Raymond's office. This contract stated that he was employed by RSA, and was signed by a representative of RSA. The person who signed the contract for RSA, however, was a Raymond employee. Baker testified that the employee who explained the contract to him told him that Raymond and RSA were the same company and that the difference in names was only for "tax purposes."

On the same day, a Raymond employee gave Baker a form for claiming income tax benefits while employed abroad. This form, filled in by a Raymond employee for Baker, stated: "I am employed by Raymond International, Inc." Baker also signed a life insurance beneficiary designation, filled in by a Raymond employee, stating that his employer was Raymond.

Baker was transported to Saudi Arabia and began work. He received a monthly pay sheet stamped with Raymond's logo, the letters RI superimposed on a globe, which had also appeared on each of the newspaper advertisements.

A trestle extending seven miles into the Persian Gulf was being built pursuant to a contract between RSA and the Arabian American Oil Company (Aramco). Baker was assigned to this project, working aboard the pile-driving barge *Loretta*, which belonged to Raymond, as a piledriver-rigger. In September, together with other workers, he was engaged in repairing the barge when he was injured.

After his return to the United States, Baker sued Raymond, as sole defendant, under the Jones Act for negligence causing his injury and for unseaworthiness of the *Loretta*. The theory of this suit was that Raymond was Baker's employer, and, as owner, was responsible for the condition of the *Loretta*. On the morning that trial commenced, before the jury was empaneled, the trial judge told counsel that Baker could recover on the Jones Act claim only by proving that Baker was Raymond's borrowed servant or that RSA was Raymond's instrumentality. After brief expostulation, Baker's counsel accepted these theses. Raymond's counsel objected, but evidently was able to confront the revised claims; Raymond does not contend on appeal that the changes so surprised it as to have required postponing the trial.

In response to interrogatories, the jury found that Raymond was negligent in a manner that caused Baker's injury and that the *Loretta* was unseaworthy in a manner that proximately caused his injury, and returned a verdict in Baker's favor. No issue is raised on appeal with regard to either of these findings.

Raymond's defense was that Baker was employed solely by RSA, and that, because RSA had chartered the *Loretta*, Raymond was not liable for its condition. The jury was not asked, however, whether Raymond was Baker's employer or was responsible

for the condition of the *Loretta*. Instead, the interrogatories asked only whether Raymond was RSA's corporate alter ego or whether Baker was Raymond's borrowed servant. On appeal, Raymond contends both that the alter ego jury charge was erroneous and that the evidence was insufficient to support the borrowed servant verdict.

Raymond presented evidence that it owns none of the stock of RSA. It does own all of the stock of Raymond International of Delaware, Inc., which, in turn, owns 50% of the stock of RSA. The remainder of the stock of RSA is owned by Saudi Arabian corporations and princes of the Saudi Arabian realm. The reason, business or otherwise, for this complex arrangement does not appear in the record.

RSA was chartered in Saudi Arabia in 1977. Some of its officers and directors were officers and directors of Raymond. Shortly after its formation, it entered into a contract with Aramco to build the marine trestle, its first project.[2] Raymond recruited employees in the United States for this work and interviewed them. A Raymond employee testified that RSA made the final employment decision, but the record does not show how the decision was made or what person made it.[3]

Raymond furnished the barge *Loretta* for the project. It purchased material, equipment, and parts for the barge. It also arranged transportation and provided group insurance plans and retirement plans for RSA employees when it recruited. The costs of these services were paid by RSA, some from RSA operating accounts maintained in Houston banks and others, together with a fee for Raymond's services, by intercorporate charges. Because RSA was not joined as a defendant, we need not consider whether it was doing business or

was amenable to service of process in the United States.

## II. Jones Act Claim

### A. The Borrowed Servant Doctrine

■ The Jones Act, 46 U.S.C. § 688, confers upon a seaman the right to sue his employer for negligence resulting in his personal injury, extending to him the rights accorded railway workers under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60. Although recovery may be had in admiralty for negligence resulting in the injury of a person who is not an employee, the Jones Act provides the only negligence remedy for an employee against his employer. *Ivy v. Security Barge Lines, Inc.*, 606 F.2d 524, 525 (5th Cir. 1979) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980). Correlatively, it is applicable only if the employment relationship exists. *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 791, 69 S.Ct. 1317, 1322, 93 L.Ed. 1692, 1698 (1949); *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 394, 90 S.Ct. 1772, 1784, 26 L.Ed.2d 339, 353 (1970); *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 224 (5th Cir. 1975); G. Gilmore & C. Black, *The Law of Admiralty* §§ 6–21, –21(a) (2d ed. 1975) (hereinafter *Gilmore & Black*).

The employer-employee bond is usually evident: the vessel owner engages the seaman, pays his wages, and, through the master, directs his work. In the complex industrial arrangements typical of offshore petroleum development operations, however, the attributes of employment may not all inhere in the vessel owner. A number of companies may engage in a single project, usually by subcontract from the company undertaking the venture. Each subcontractor undertakes to do a particular task as an

---

**2.** Up to the time of trial, it had started no other projects. There was testimony that it was "free to do so." At the time of trial it was bidding on other jobs.

**3.** There was other evidence that Raymond considered the trestle job as its project. Its annual report to its stockholders carried a photograph of the trestle, referred to the project as "our"

trestle job, and stated that Raymond was doing the work. The report does not mention RSA. There was also other evidence of corporate affinity: Raymond maintained personnel files on employees of RSA, and the chief executive officer of RSA was an employee of another Raymond affiliate, Raymond International United Kingdom.

independent contractor, but a worker on the payroll of one company may actually perform his job under the direction and control of another. Moreover, the vessel on which the work is performed may be owned by the firm that issues the employee's paychecks, by the principal contractor, or by a third party, and may be chartered or otherwise provided for the project.

In the usual case involving injury to a seaman, either the principal contractor or the shipowner is more affluent and accessible than the subcontractor; a worker nominally employed by a subcontractor seeks to establish an employment relationship with the better target. *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 224 (5th Cir. 1975). If that target company has, in fact, assumed significant attributes of an employer, it will not be permitted to shed the employer's costume when the worker is injured. *See United States v. W. M. Webb, Inc.*, 397 U.S. 179, 192, 90 S.Ct. 850, 856, 25 L.Ed.2d 207, 215 (1970); *Barrios v. Louisiana Constr. Materials Co.*, 465 F.2d 1157, 1163–66 (5th Cir. 1972); *Gilmore & Black, supra*, § 6–21(a).

■ The borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer. It permits the injured worker to recover from the company that was actually directing his work. It may also determine which of the possible employers ultimately bears the cost of the injury. *See Spinks v. Chevron Oil Co.*, 507 F.2d 216, 224–26 (5th Cir. 1975).

However, the actual employer does not wholly displace the nominal one. If the worker is hired and paid by a subcontractor, he may look to it as his employer even though, on the job, he worked under the direction and control of the principal contractor. *Id.* at 224–25. When the contractual or operational relationship between those who direct a seaman's work results in his being on the payroll of one company and obeying the behest of another, the injured worker is not required to bear the risk that he will not select the proper target for his claim.

At trial, Baker did not contend that Raymond was his nominal, or contractual employer, or that the contract of employment should be reformed, or that Raymond was estopped to deny that it stood in an employer's role to him. The first interrogatory submitted to the jury assumed that Raymond was not his employer, and asked whether Raymond had borrowed Baker from his contractual employer, assumed presumably to be RSA.

■ An injured worker may show that he was a borrowed servant at the time of his injury by establishing that the employer against whom recovery is sought had " 'the power to control and direct the [servant] in the performance of [his] work.' " *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978) (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221–22, 29 S.Ct. 252, 254, 53 L.Ed. 480, 483–84 (1909)). This circuit has established several criteria for determining when a servant has been borrowed by another employer:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Gaudet v. Exxon Corp.*, 562 F.2d at 355 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969)).

■ At the trial, Baker introduced virtually no evidence establishing any of these factors. Raymond's evidence, uncontradicted by Baker, was that the master of the vessel, and its crew, were employed by RSA, the vessel was operated by RSA, and RSA paid Baker's wages. Although Raymond owned the vessel, there was no evidence that those employees who were found to be negligent were Raymond employees. The record is equally silent on any borrowing of Baker himself by Raymond. If, as the borrowed servant doctrine assumes, we begin with the premise that Baker was an RSA employee, "the facts and inferences point so strongly and overwhelmingly" to the conclusion that Raymond did not later borrow Baker "that the Court believes that reasonable men could not arrive at a contrary verdict." *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc). Accordingly, we reverse the jury's verdict on this issue and proceed to examine the other basis for Baker's recovery under the Jones Act.

B. RSA as Raymond's Instrumentality

Although scholars may debate its economic importance,[4] the principle of limited liability remains a dominant characteristic of American corporation law. Ordinarily, a creditor has recourse only against the corporate entity incurring the liability, not against parent corporations, stockholders, or other parties connected with the entity. Under exceptional circumstances, however, the courts will exercise their equitable power to hold the controlling parties liable for the obligations of their instrumentality. *See FMC Fin. Corp. v. Murphree,* 632 F.2d

413, 421, 422 (5th Cir. 1980); *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.,* 483 F.2d 1098, 1102–07 (5th Cir. 1973), *modified per curiam,* 490 F.2d 916 (5th Cir. 1974); *Berkey v. Third Ave. Ry.,* 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926) (Cardozo, J.). *See generally* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 41–46 (rev.perm.ed. 1974 & Cum. Supp. 1980) (collecting cases).

■ Beyond the commonplace that the courts will ignore the principle of limited liability when " 'the justice of the case' " requires, *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.,* 483 F.2d 1098, 1103 (5th Cir. 1973) (quoting *United States v. Reading Co.,* 253 U.S. 26, 63, 40 S.Ct. 425, 434, 64 L.Ed. 760, 781 (1920)), *modified per curiam,* 490 F.2d 916 (5th Cir. 1974), there appears to be no encompassing doctrinal basis for determining when principals will be liable for the obligations of the corporations they control. At best, we can but list exemplars.[5] If a controlling stockholder uses a closed corporation as his personal business conduit, he may be held responsible for the debts of his "alter ego." *See, e.g., St. Paul Ins. Cos. v. Talladega Nursing Home, Inc.,* 606 F.2d 631, 635 & n.4 (5th Cir. 1979). A parent corporation may be held liable for the debts of a subsidiary if the parent fails to observe the formalities of separate incorporation, including adequate capitalization of the subsidiary. *See, e.g., DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686 & n.14 (collecting cases), 688–89 (4th Cir. 1976); *Arnold v. Phillips,* 117 F.2d 497, 502 (5th Cir.), *cert. denied,* 313 U.S. 583, 61 S.Ct.

---

4. *Compare* Meiners, Mofsky & Tollison, *Piercing the Veil of Limited Liability,* 4 Del.J.Corp.L. 351, 352 (1979) (limited liability "has [no] significant impact at all") *with* Posner, *The Rights of Creditors of Affiliated Corporations,* 43 U.Chi.L.Rev. 499 (1976) (extolling the principle) *and* Landers, *A Unified Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy,* 42 U.Chi.L.Rev. 589 (1975) (urging relaxation of the principle).

5. The imposition of liability on a principal for the debts of the corporation has been summed up by attractive metaphors like "piercing the corporate veil" and "holding a corporation lia-

ble for the acts of its alter ego." These gnomic phrases are used interchangeably, although literally they suggest different concepts. Moreover, they describe results, but not the reasoning that leads to those results; they tell us nothing about the basis for imposition of liability. The use of such phrases as a basis for decision occasioned Cardozo's famous warning: "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Ave. Ry.,* 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926).

1102, 85 L.Ed. 1539 (1941). If the corporation is employed to perpetrate a fraud upon a creditor, he may impose liability on its stockholders. *See, e.g., FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 423 (5th Cir. 1980); Posner, *The Rights of Creditors of Affiliated Corporations*, 43 U.Chi.L.Rev. 499, 521 (1976). Finally, a principal (usually a parent company) may so dominate the activities of a corporation that it is necessary to treat the dominated corporation as an agent of the principal. *See Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1102–03 (5th Cir. 1973), *modified per curiam*, 490 F.2d 916 (5th Cir. 1974); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 838–41 (D.Del. 1978).

Baker alleged [6] and the jury found that Raymond exercised sufficient control of RSA to justify holding Raymond liable as Baker's actual Jones Act employer. Although the evidence might be sufficient to support this finding, we are unable to affirm it as a basis for imposing liability because the charge did not provide the jury with an adequate understanding of the factors to be considered in reaching it.

The court gave the following charge on this issue:

A corporation which exercises actual control over another and operates the latter as a mere instrumentality or tool is liable for the obligations of the corporation it controls. In determining if such a relationship existed between the defendant and Raymond Saudi Arabia, you should consider the following factors:

(1) Common stock ownership

(2) Common directors or officers

(3) Whether the defendant finances Raymond Saudi Arabia

(4) Whether the defendant caused the incorporation of Raymond Saudi Arabia

(5) Whether Raymond Saudi Arabia operates with grossly inadequate capital

(6) Whether the defendant pays the salaries and other expenses or losses of Raymond Saudi Arabia

(7) Whether Raymond Saudi Arabia receives any business except that given to it by the defendant

(8) Whether the defendant uses Raymond Saudi Arabia's property as its own

(9) Whether the directors and officers of Raymond Saudi Arabia act independently in the interest of that company, or whether they take their orders from the defendant and act in the defendant's interest.

Portions of the charge, particularly the opening paragraph, are substantially correct. However, the court failed to present adequately and in context the factors that might warrant the imposition of vicarious liability. The court should first have explained at least the rudiments of limited liability. Otherwise, jurors might believe, with the Raymond recruiter whom Baker encountered, that separate incorporation is important only for mysterious "tax purposes" and that the corporate form may otherwise be lightly disregarded. The jury should have been instructed that the stockholders in any adequately capitalized and legally operated corporation are immune from liability for its debts in the absence of the exceptional circumstances to be described by the court, and that the plaintiff bears the burden of proving that these circumstances exist.

The charge should then have accurately described to the jury the degree of control that must be found to establish that an ostensibly separate corporation is a mere instrumentality. Ownership of a controlling interest in a corporation entitles the controlling stockholder to exercise the normal incidents of stock ownership, such as the right to choose directors and set general policies, without forfeiting the protection of limited liability. *See Berger v. Columbia*

**6.** The contention that Raymond was estopped to deny that it was Baker's employer, *see FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 423 (5th Cir. 1980); Posner, *supra* note 4, at 520–23, was never advanced.

*Broadcasting Sys., Inc.*, 453 F.2d 991, 994 (5th Cir.), *cert. denied*, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972). To justify the extraordinary step of holding the dominant party liable, the jury must find that this control "amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir. 1973), *modified per curiam*, 490 F.2d 916 (5th Cir. 1974); *see FMC Fin. Corp. v. Murphree*, 632 F.2d 413, 422 & n.8 (5th Cir. 1980); *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 841 (D.Del. 1978) ("the control must be actual, participatory, and total").

The court might then have properly charged the jury that, in deciding whether Raymond exercised total domination over RSA, it might consider the nine factors cited by the court.[7] The jury should have been instructed that no one of these factors is dispositive and that the list does not exhaust the relevant factors.

Finally, in the light of Raymond's complicated relationship with RSA, the court should have elaborated the significance of the first factor, ownership of stock. Raymond owns no RSA stock in its own name. 50% of RSA stock is owned in the name of Raymond International of Delaware, Inc. (Raymond Delaware), a wholly owned subsidiary of Raymond. The remaining 50% is owned by Saudi Arabian princes and corporations. Although the presence or absence of stock ownership in the allegedly dominated corporation is only one factor among many, *see Krivo Indus. Supply Co. v. Na-* *tional Distillers & Chem. Corp.*, 483 F.2d 1098, 1104 (5th Cir. 1973), *modified per curiam*, 490 F.2d 916 (5th Cir. 1974), the jury should have been informed that, in theory, the legal right to control RSA is shared by Raymond Delaware and the Saudi Arabian princes and corporations, although Raymond could have in fact exercised that right through its ownership of Raymond Delaware.

■ The jury's finding of vicarious liability is vacated. Because, as we discuss in Part IV, Baker's right to maintenance, cure, and wages to the end of the voyage depends on his establishing an employment relationship, we remand for a new trial on the issue.

### III. Responsibility for the Vessel

■ Both ship and shipowner are liable to seamen for injuries caused by unseaworthiness. *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, 764 (1903); *see Gilmore & Black, supra*, §§ 6–38 to –44. The duty to provide a seaworthy vessel is absolute and extends not only to the owner's employees but to all who do seaman's work. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).[8] This duty is commonly called a warranty of seaworthiness, not because it is a warranty, but because it is a species of liability without fault and the duty is an "absolute, continuing, and nondelegable" incident of vessel ownership. *Allen v. Seacoast Prods., Inc.*, 623 F.2d 355, 364 (5th Cir. 1980). To be held liable for breach of the duty, the defendant "must be in the relationship of an owner or operator of a vessel." *Daniels v. Florida Power & Light Co.*, 317 F.2d 41, 43 (5th Cir.), *cert. denied*, 375 U.S. 832, 84 S.Ct. 78, 11 L.Ed.2d 63 (1963). A bareboat

---

7. The reliance on these factors by the factfinder in a bench trial was approved in *Bay Sound Transp. Co. v. United States*, 474 F.2d 1397 (5th Cir. 1973) (per curiam), *aff'g* 350 F.Supp. 420 (S.D.Tex. 1972), *cert. denied*, 415 U.S. 916, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974). These factors were initially set forth in *Taylor v. Standard Gas & Elec. Co.*, 96 F.2d 693, 704–05 (10th Cir. 1938) (quoting *Powell on Parent and Subsidiary Corporations*), *rev'd on other grounds*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939).

8. No libel in rem has been asserted against the *Loretta*; we consider only the claim for personal liability against Raymond as its owner. The case does not, therefore, present the question whether there can be in rem liability if the owner is not liable in personam, decided by us in *Grigsby v. Coastal Marine Serv.*, 412 F.2d 1011, 1023–29 (5th Cir. 1969), *cert. denied*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

or demise charter (hereinafter called a bareboat charter), whereby the charterer assumes "full possession and control of the vessel," *Reed v. Steamship Yaka*, 373 U.S. 410, 412, 83 S.Ct. 1349, 1351, 10 L.Ed.2d 448 (1963), constitutes the only form of charter that purports to invest temporary powers of ownership in the charterer[9] and, therefore, constitutes the only conceivable basis on which the vessel owner could seek to escape liability for the unseaworthiness of his vessel. *See Guzman v. Pichirilo*, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); *Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973); *Solet v. M/V Capt. H. V. Dufrene*, 303 F.Supp. 980, 983–85 (E.D.La. 1969).

Baker's recovery was also predicated on the ground that Raymond was liable for the unseaworthiness of the *Loretta*. Raymond does not challenge the jury's finding that the vessel was unseaworthy. It contends, instead, that, because it had relinquished control of the *Loretta* to RSA, it did not owe Baker the duty to provide him a seaworthy vessel. We conclude that Raymond could not make a valid bareboat charter relinquishing control to RSA and that even such a charter would not have released it from its liability as owner for the unseaworthiness of its vessel. We affirm the jury's award of compensatory damages on this basis.

In addition to his comments on the Jones Act claim, on the morning the trial began, the trial judge said he would not consider Raymond's argument because a charter to a noncitizen of the United States sufficient to relieve the owner of control was inferentially prohibited by regulation of the Department of Commerce, Maritime Administration.[10]

◼ Because the Maritime Administration has prohibited "demise or bareboat charters" to aliens, Raymond cannot escape liability for the *Loretta*'s unseaworthiness. Any attempted bareboat charter between Raymond and RSA was void ab initio; a court cannot enforce an illegal contract to the detriment of an innocent third party. *See Tampa Elec. Co. v. Nashville Coal Co.*, 276 F.2d 766, 773 (6th Cir. 1960), *rev'd on other grounds*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); J. Murray, *Murray on Contracts* §§ 344, 346, 347 (2d rev.ed. 1974).

◼ Raymond argues alternatively that, mutatis mutandis, the fact that RSA had complete possession and control of the *Loretta* absolves Raymond of liability. There is no support for this thesis that the mere surrender of control of a vessel absolves its owner. If a shield is possible, it can be provided only by a valid bareboat charter. "[A]nything short of . . . a complete transfer is a time or voyage charter party or not a charter party at all"; the owner remains liable for unseaworthiness. *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 208 (1962). An invalid transfer is scarcely a complete one.

◼ We need not rest our decision on the applicability of the regulation. Even assuming, arguendo, that there was a bareboat charter to RSA, we conclude that it would not have absolved the vessel owner of liability for the vessel's unseaworthiness.

---

9. The charterer is described as the "owner *pro hac vice.*" *See, e.g., Reed v. Steamship Yaka*, 373 U.S. 410, 412, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448, 451 (1963).

10. 46 C.F.R. § 221.7(a) (1981) provides in pertinent part:

The Department of Commerce, Maritime Administration, hereby approves under sections 9, 37 and 41 of the Shipping Act, 1916, as amended (46 U.S.C. 808, 835 and 839), the charter to a person not a citizen of the United States of any vessel (including space in such vessel) documented under the laws of the United States, or the last documentation of which was under the laws of the United States, or by a corporation organized under the laws of the United States or of any State, Territory, District or possession thereof. In general, as to each vessel, the approval shall extend for a period of not more than six (6) months, or for a voyage or voyages that will probably terminate before the expiration of six months . . . . Approval will not be granted to charters of the following nature:

(1) Demise or bareboat charters.

The regulation in force prior to March 1, 1977, permitted application to be made for a bareboat charter of a vessel to a foreign citizen or corporation. The record contains no evidence concerning when the alleged

The Supreme Court has twice avoided deciding whether a bareboat charter relieves the owner of liability for unseaworthiness. *See Reed v. Steamship Yaka*, 373 U.S. 410, 411 n.1, 83 S.Ct. 1349, 1351 n.1, 10 L.Ed.2d 448, 450 n.1 (1963); *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 208 (1962). The lower courts have generally agreed that, after control of the vessel is turned over to the charterer, the owner remains liable for injuries caused by defects in the vessel that existed before the commencement of the charter.[11] In several instances, assuming the answer to the question now directly raised, courts have, however, stated that delivery of the vessel to a bareboat charterer terminates the owner's liability for conditions that arise only thereafter.[12]

The origin of these distinctions lies in 19th century doctrine concerning civil liability. Liability in contract was based on privity and in tort on subjective fault or negligence. *Gilmore & Black, supra*, § 9–18(a), at 621; W. Prosser, *Handbook of the Law of Torts* §§ 92–93 (4th ed. 1971). This development was influenced by the political and economic need to encourage enterprise.[13] If a vessel owner turned over a seaworthy vessel to a bareboat charterer, and thereafter the charterer incurred additional obligations or caused injury, contemporary thought held that the faultless shipowner should not be liable. The blameworthy charterer, however, often proved to be insolvent. If truly innocent third persons were to be protected against harm inflicted as a result of the vessel's operation, it was necessary to reach the owner's purse. At the dawn of this century, therefore, in dictum "of the most authoritative kind,"[14] the Supreme Court modified 19th century doctrine. *In The Barnstable*, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901), the Court stated that a vessel is liable in rem for damage done by it while in the control of charterers. The court cited as authority in part for this observation its earlier decision in *The China*, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1869), holding a foreign vessel liable in rem for damage to a domestic vessel resulting from a collision caused by a compulsory pilot's negligence.

These decisions improvised a pragmatic economic solution to the problem of risk allocation. The injured third person was not confined to exploring the potentially empty purse of the charterer but could secure redress by affixing a lien to the vessel. In an effort to fit this jerry-built remedy into comfortable legal doctrine, courts and commentators spun the fiction of personification of the ship; it is the vessel that is liable in these circumstances. *See Gilmore & Black, supra*, §§ 9–4, –18. The personification theory did not, however, weather all legal storms. In many situations, "the vessel" was not held liable for claims against

---

verbal charter was entered into and no suggestion that it was approved.

11. *See Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 96 (5th Cir.), *modified per curiam*, 520 F.2d 1104 (1975); *Hamilton v. Canal Barge Co.*, 395 F.Supp. 978, 988 (E.D.La.1975); *Solet v. M/V Capt. H.V. Dufrene*, 303 F.Supp. 980, 984 (E.D.La.1969).

12. *See Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 96 (5th Cir.), *modified per curiam*, 520 F.2d 1104 (1975) (dictum); *Kerr-McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir. 1973); *In re Marine Sulphur Queen*, 460 F.2d 89, 100 (2d Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972); *Ramos v. Beauregard, Inc.*, 423 F.2d 916, 917–18 (1st Cir.), *cert. denied*, 400 U.S. 865, 91 S.Ct. 101, 27 L.Ed.2d 104 (1970); *Haskins v. Point Towing Co.*, 421 F.2d 532, 536 (3d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 68, 27 L.Ed.2d 66 (1970); *Cannella v. Lykes Bros. S.S. Co.*, 174

F.2d 794, 795 (2d Cir.) (L. Hand, J.), *cert. denied*, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526 (1949).

In *Nat G. Harrison Overseas Corp. v. American Tug Titan*, the panel noted two cases limiting the owner's liability to defects arising before delivery, calling them "a fair statement of the law," 516 F.2d at 96, but decided its case on the basis that the defects alleged had all arisen before the date of delivery. Consequently, we are not bound by this dicta. The issue has also been discussed, though not decided, in *Grigsby v. Coastal Marine Serv.*, 412 F.2d 1011, 1030–31 (5th Cir. 1969), *cert. denied*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

13. *See generally* M. Horwitz, *The Transformation of American Law, 1780–1860* (1977).

14. *Gilmore & Black, supra*, § 9–10, at 601.

its charterer-possessor. Liens were not indelible; they were not enforced against good faith purchasers without notice. "[T]he fiction of ship's personality," according to Professors Gilmore and Black, "has never been much more than a literary theme," now fallen into disrepute. *Id.* § 9–18, at 616. More recently, in *Reed v. Steamship Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), the Court held that a vessel remained liable in rem for unseaworthiness arising after delivery to a bareboat charterer, in part as a means of avoiding the decision we make today. *See Grigsby v. Coastal Marine Serv.*, 412 F.2d 1011, 1031 (5th Cir. 1969), *cert. denied*, 346 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970); *Solet v. M/V Capt. H.V. Dufrene*, 303 F.Supp. 980, 985 (E.D.La.1969). The Court thus continued its attempt to accommodate the notion that the owner should not be held liable for faults beyond his control with the recognition that a seaman may have no recourse against the judgment-proof charterer. *See Gilmore & Black, supra*, § 9–18(a), at 621.

This accommodation is no longer needed. Admiralty, like common law, now imposes liability without fault. The exuberant development of strict liability for unseaworthiness is but one example. *See Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955). With Professors Gilmore and Black, *Gilmore & Black, supra*, § 9–18(a), at 622, we now see no useful purpose served by restricting seamen to a remedy in rem as the sole means of holding the owner liable. The restriction functions, instead, only as a pleading trap for the unwary and as a purely fortuitous means whereby an owner may escape liability if his vessel is beyond the court's jurisdiction.

As a matter of policy, we treat seamen protectively, as "wards of admiralty." *U.S. Bulk Carriers, Inc. v. Arquelles*, 400 U.S. 351, 355, 91 S.Ct. 409, 411, 27 L.Ed.2d 456, 461 (1971); *Robertson v. Baldwin*, 165 U.S.

275, 287, 17 S.Ct. 326, 331, 41 L.Ed. 715, 719 (1897). In *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975), we followed this policy and held it no longer necessary "that an injured seaman . . . speculate at his peril" on the identity of his Jones Act employer. *Id.* at 225. Similarly, an injured seaman, of presumably limited resources, should not have to speculate on when the unseaworthy condition of a vessel arose or whether a valid bareboat charter existed. No continuing purpose is accomplished by requiring him to seek out and attach the vessel. If injured by its unseaworthiness, he should be able to sue its owner. The allocation of ultimate liability should be the responsibility of the owner and charterer, who "can sort out which between them will bear the final cost of recovery." *Id.*

We make explicit what was implicit in *The Barnstable*: a seaman may have recourse in personam against the owner of an unseaworthy vessel, without regard to whether owner or bareboat charterer is responsible for the vessel's condition. This personal liability is not, of course, unlimited. It is subject to the ceiling established by the Limitation Act, 46 U.S.C. § 183(a). If the vessel's unseaworthiness is not the result of the owner's knowledge or privity, his total actual exposure may be limited to the value of the vessel.

We hold that Raymond was liable for the unseaworthiness of the barge. This liability is sufficient, in itself, to support the jury's award of damages compensating the injuries suffered by Baker. That award is affirmed.

IV. Failure To Pay Maintenance, Cure, and Wages to the End of the Voyage

Baker also sought to recover damages from Raymond for its allegedly arbitrary failure to pay him maintenance, cure, and wages to the end of the voyage. The jury awarded him $12 a day for maintenance, $31,700 for cure, $28,488 in wages to the end of the voyage, and $370,188 in damages resulting from Raymond's "arbitrary and

unreasonable" failure to pay maintenance, cure, and wages; it also awarded him attorney's fees in what the jury called "the customary amount or as agreed between plaintiff and his attorney." The court entered judgment on the compensatory awards, but granted Raymond's motion for judgment notwithstanding the verdict, nullifying the jury's award of damages and attorney's fees for Raymond's "arbitrary and unreasonable" failure to pay maintenance, cure, and wages. The judgment provided that, in the event of reversal on appeal, Raymond's motion for a new trial on this issue was granted.

■ The seaman's right to maintenance, cure, and wages to the end of the voyage all stem from the same root. *Flunker v. United States*, 528 F.2d 239, 242 (9th Cir. 1975); *Isthmian Lines, Inc. v. Haire*, 334 F.2d 521, 523 (5th Cir. 1964); *see Vickers v. Tumey*, 290 F.2d 426 (5th Cir. 1961); *Gilmore & Black, supra*, § 6-12. Although an injured seaman's right to these forms of support is implied by law, it "arises out of the contract of employment." *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981); *see Vaughan v. Atkinson*, 369 U.S. 527, 532-33, 82 S.Ct. 997, 1000-01, 8 L.Ed.2d 88, 92-93 (1962); *Cortes v. Baltimore Insular Line, Inc.*, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368, 371 (1932); *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547, 548 (5th Cir.), cert. denied, 393 U.S. 894, 89 S.Ct. 223, 21 L.Ed.2d 175 (1968); *Gilmore & Black, supra*, § 6-7, at 285. Wages are the quintessential obligation of an employer to his employee. Consequently, seamen will ordinarily look to their employer for these compensatory payments.

■ In addition, seamen may sue in rem to recover maintenance, cure, and wages to the end of the voyage. *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, 764 (1903); *Solet v. M/V Capt. H.V. Dufrene*, 303 F.Supp. 980, 987 (E.D.La.1969); *Gilmore & Black, supra*, § 6-7, at 284-87. The right to sue in rem "arises from 'the

peculiar relationship existing between the seaman and his vessel,'" *Solet v. M/V Capt. H.V. Dufrene*, 303 F.Supp. at 987 (quoting 1 M. Norris, *Seamen* 592 (2d ed. 1962)), not on the theory that the vessel owner owes these duties by virtue of his ownership. Maintenance, cure, and wages remain, however, the particular responsibility of the employer, unlike the liability for unseaworthiness, which arises directly from ownership of the vessel. The liability is an amount usually far more modest, and, in the typical case, the seaman is required to look no further than the desk at which he signed articles to locate his employer. Neither policy nor precedent permits a seaman to sue a non-employing owner in personam for maintenance, cure, and wages, and nothing in this case constrains us to reexamine them.

■ Baker has not sued the *Loretta* in rem. We have reversed the jury's finding that Raymond was Baker's employer under the borrowed servant doctrine and vacated the jury's finding that RSA, Baker's nominal employer, is the instrumentality of Raymond. Because we are left with no finding establishing Raymond as Baker's employer, we vacate the awards of maintenance, cure, and wages to the end of the voyage, and remand for a new trial on Baker's claim that the court should treat Raymond as Baker's employer.

### V. Summary

The jury's award of compensatory damages to Glenn Baker is AFFIRMED, though solely on the ground that Raymond International, Inc., was liable for the unseaworthiness of its barge, the *Loretta*.

The jury's award of maintenance, cure, and wages to the end of the voyage is VACATED, as is the judgment notwithstanding the verdict as to damages resulting from Raymond International's failure to pay these items. The cause is REMANDED for a new trial to determine whether Raymond International must be treated as Glenn Baker's employer.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.