NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1426
_____

JASON FETTER,
Appellant

v.

MAERSK LINE LIMITED; 3MC MOBILE & MECHANICAL REPAIR, LLC
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-14-cv-2108)
District Judge: Hon. Katharine S. Hayden
_____

Argued
May 14, 2021

Before: McKEE, JORDAN, and FUENTES, *Circuit Judges.*

(Filed   July 15, 2021)
_____

Micajah D. Boatright
Andrew R. Gould   [ARGUED]
Arnold & Itkin
6009 Memorial Drive
Houston, TX   77007

Heather K. D'Onofrio
The D'Onofrio Firm
P.O. Box 16
Wallingford, PA   19086
        *Counsel for Appellant*

Matthew J. Pallay
John J. Walsh   [ARGUED]
Freehill Hogan & Mahar
80 Pine Street – 25th Fl.
New York, NY   10005
    *Counsel for Appellee, Maersk Line Ltd.*

Matthew M. Gorden
Joseph J. Perrone   [ARGUED]
Giuliano, McDonnell & Perrone
170 Old Country Road – Ste. 608
Mineola, NY   11501
    *Counsel for Appellee, 3MC Mobile
    & Mechanical Repair LLC*

_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

Appellant Jason Fetter was injured while working as a day engineer aboard the docked M/V MAERSK MONTANA.  He appeals the entry of summary judgment in favor of Appellees Maersk Line, Limited ("Maersk") and 3MC Mobile & Mechanical Repair, LLC ("3MC") (together, the "Defendants") on his negligence and Jones Act claims.  Because there are no genuine issues of material fact, we will affirm.

## I.    BACKGROUND

Maersk had a collective bargaining agreement ("CBA") with a seafarer's union, the Marine Engineers Beneficial Association (the "Union"), which allowed Maersk to hire temporary "day engineers" to perform repairs and maintenance when ships were

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2

called to port. Pursuant to the CBA, the Union bills Maersk for the day engineers' wages, and Maersk pays the wages directly to the Union. The Union then deducts taxes and union fees from the wages and remits the remainder to the day engineers. If several maintenance projects are going on at once, Maersk also may decide to hire an outside company to help supervise the day engineers' work.

Maersk owns and operates a vessel called the MAERSK MONTANA. The ship's captain requested five Union day engineers to perform repair and maintenance tasks while the ship was in port at Newark, New Jersey, on October 9, 2012. Maersk also requested that, 3MC, through its employee Greg Higgs, supervise the day engineers performing the tasks.

Fetter, a member of the Union, bid on and received one of the day engineer jobs aboard the MONTANA. He understood he was hired to work for only one day and would not sail with the ship. On the appointed day, Fetter and four other day engineers reported to the MONTANA. Higgs reported as well. After they boarded the ship, the MONTANA's first assistant engineer, David Peterson, told Higgs and the day engineers about the work to be completed that day, showed them where tools were located, and ran through Maersk's procedures. Higgs then tasked Fetter and two of his colleagues with removing a stuck injector in the ship's main engine. After Higgs suggested to Fetter and his colleagues how to complete the task, Higgs went to another part of the ship to assist with repairing an automatic start air valve. While Fetter was attempting to remove the stuck injector, "the chain being used to pull the injector broke[,]" causing an object to

3

strike Fetter's face near his eye. (Opening Br. at 8.) The resulting injuries were severe.

Higgs learned of the accident and Fetter's injuries a few hours later.

Fetter subsequently filed a common law negligence action against Maersk in state court. Maersk removed the matter to federal court, and Fetter amended his complaint, adding 3MC as a defendant and also adding a Jones Act claim. Following discovery, the Defendants filed motions for summary judgment. They argued that Fetter was not a Jones Act seaman and that his negligence claims are barred by the exclusivity provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq*. In a thorough and well-reasoned opinion, the District Court granted summary judgment for the Defendants. This timely appeal followed.

## II. DISCUSSION[1]

Fetter argues that the District Court erred when it concluded that there were no genuine issues of material fact as to the following: 1) whether he was a borrowed servant of Maersk, barring him from bringing a negligence claim against Maersk under the LHWCA; 2) whether 3MC employee Greg Higgs was a borrowed servant controlled by Maersk, thus barring Fetter from bringing a negligence claim against 3MC under the

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1333. We have appellate jurisdiction under 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary. *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996). In evaluating the Defendants' motions for summary judgment, we determine whether there are any genuine disputes of material fact, and, if not, we view the evidence in the light most favorable to Fetter and decide whether the Defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

4

LHWCA; and 3) whether Fetter was a "seaman" for purposes of the Jones Act, 46 U.S.C. § 30104.

The LHWCA and the Jones Act are two "mutually exclusive compensation regimes[.]" *Chandris, Inc. v. Latsis*, 515 U.S. 347, 355-56 (1995). The Jones Act provides "heightened legal protections (unavailable to other maritime workers) [to] seamen … because of their exposure to the 'perils of the sea.'" *Id.* at 354. For maritime workers not entitled to the benefits of the Jones Act, the LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 96 (1994). In exchange for such no-fault compensation payments, the LHWCA displaces the employee's common-law right to bring an action in tort against his employer and fellow employees. 33 U.S.C. §§ 904, 905(a), 933(i).

For the purposes of the LHWCA, the term "employer" includes a "borrowing employer" under the borrowed servant doctrine. *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 940 (3d Cir. 1990). In an industry where it is commonplace for employers to lend their employees to another entity for a specific project or voyage, the borrowed servant doctrine seeks to "place the risk of a worker's injury on his actual rather than his nominal employer[.]" *Hall v. Diamond M Co.*, 635 F. Supp. 362, 364 (E.D. La. 1986) (citing *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 178 (5th Cir. 1981)); *see also White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000) (explaining that an individual may be in the "general employ of one company while at the same time being in the

5

particular employ of another 'with all the legal consequences of the new relation'" (citation omitted)).

To determine whether a borrowed servant relationship exists, we consider a multi-factor test developed by the Fifth Circuit, with a focus on two comprehensive questions that are crucial in the workers' compensation context: "(1) whether the borrowing employer was responsible for the borrow[ed] employee's working conditions and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his new employment."[2]  *Peter*, 903 F.2d at 942 (citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 357 (5th Cir. 1977), *cert. denied*, 436 U.S. 913 (1978)).

---

[2] The factors identified by the Fifth Circuit are:

(1) Who has control over the employee and his work?  (2) Whose work is being performed?  (3) Was there an agreement between the original and borrowing employer?  (4) Did the employee acquiesce in the new work situation?  (5) Did the original employer terminate his relationship with the employee?  (6) Who furnished the tools and place for performance?  (7) Was the new employment over a considerable length of time?  (8) Who has the right to discharge the employee?  (9) Who had the obligation to pay the employee?

*Peter*, 903 F.2d at 942 n.7 (citing *West v. Kerr-McGee Corp.*, 765 F.2d 526, 530 (5th Cir. 1985)).

## A.     Fetter was Maersk's borrowed servant.

First, Fetter argues that there are genuine issues of material fact as to whether Fetter was Maersk's borrowed servant. We disagree. No reasonable juror could find that Fetter was not Maersk's borrowed servant.[3]

Maersk engaged Fetter's services pursuant a CBA with the Union. Only Maersk – not 3MC or Higgs – had the authority to dismiss Fetter. Maersk paid the Union, who after deducting certain union fees and taxes, paid Fetter. And, although Higgs did exercise some control over Fetter, Maersk retained ultimate control over the engine room and the individuals working in it. Maersk requested and planned for Fetter to work on the ship. It outlined the specific projects to be completed and provided the necessary tools. Higgs was hired to provide "supervisory assistance," but the record amply demonstrates that Maersk retained overall control of the work in the engine room, including Fetter's work. In addition, Fetter's experience and the nature of his temporary assignment allowed him to quickly understand and acquiesce to the risks of working on the MONTANA. *Cf. Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1132 (11th Cir. 2011) ("Courts almost invariably have determined that employees of a labor broker, by accepting their employment with the labor broker, consciously consented to being sent to work in varying employment situations, under the direction and control of their employer's various clients.").

---

[3] The District Court concluded that Fetter was an employee of Maersk, but "[w]e can affirm the District Court's grant of summary judgment on any basis supported by the record." *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 753 (3d Cir. 2017).

7

As a borrowed servant, Fetter falls within the ambit of the LHWCA, and is thus barred from bringing a common law tort claim against Maersk.

**B.    Higgs was Maersk's borrowed servant.**

Fetter also argues that there are genuine issues of material fact as to whether 3MC's employee Higgs was Maersk's borrowed servant.  Again, we disagree.

Fetter has failed to identify evidence that would allow a reasonable juror to conclude that anyone other than Maersk had control of Higgs on the day of Fetter's injury.  Once on board the MONTANA, Maersk's crew had the power to direct and supervise Higgs, and the record shows it did so.  Maersk's first assistant engineer Peterson reviewed the day's tasks with Higgs prior to Higgs beginning work.  Only with Peterson's "advice and consent" regarding the proper repair method did Higgs proceed to repair the auto start air valve.  (App. at 247 ¶ 23.)  Further, Peterson held the authority to dismiss Higgs if he had any issues with his performance.  Maersk also provided the tools and place for performance of Higgs's work.

We also agree with the District Court that, viewing the evidence in the light most favorable to Fetter, Higgs's extensive work experience and the nature of his temporary assignment with Maersk allowed him to quickly know, appreciate, and acquiesce to the hazards and risks of working on the MONTANA under the supervision and control of Maersk.  While it is true that duration of work is often a factor in determining whether a worker acquiesced to a borrowed employer, that does not mean that a borrowed servant relationship can never arise from brief assignments.  *See Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 618 (5th Cir. 1986) (explaining that, when short, the duration of

8

employment provides only a "neutral assessment"). Thus, Fetter's arguments that there are genuine issues of material fact as to whether Higgs was a borrowed servant of Maersk are unavailing. Higgs was a borrowed servant, and Fetter is thus barred from suing 3MC for negligence.[4]

### C. Fetter does not qualify as a Jones Act seaman.

Finally, Fetter argues that there are genuine issues of material fact as to whether he was a seaman covered by the Jones Act. Not so.

The Supreme Court has articulated a two-prong standard to determine who qualifies as a seaman. *See Chandris*, 515 U.S. at 368. First, the individual's "duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.'" *Id.* at 368 (citation omitted). Second, the individual must have a connection to a vessel or group of vessels "in navigation … that is substantial in terms of both its duration and its nature." *Id.* The purpose of the second prong is "to separate the sea-based maritime

---

[4] Again, the LHWCA provides the *exclusive* remedy to a covered maritime employee and insulates the injured party's employer and fellow employees from tort liability. 33 U.S.C. § 933(i) ("The right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured … by the negligence or wrong of any other person or persons in the same employ[.]").

The parties appear to agree that § 933(i) immunity can extend to 3MC – Higgs's nominal employer – in these circumstances, and we accept that for purposes of this appeal. *Khan v. Att'y Gen.*, 691 F.3d 488, 495 n.4 (3d Cir. 2012) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (alteration in original) (quoting *Skretvedt v. E.I. DuPont DeNemours*, 372 F.3d 193, 202-03 (3d Cir. 2004))); *see also Perron v. Bell Maint. & Fabricators, Inc.*, 970 F.2d 1409, 1412 (5th Cir. 1992) (concluding that LHWCA tort immunity is "not personal to the co-employee, but rather 'inhere[d] in the nature of the obligation'" and is therefore available to a co-employee's solidary obligors (e.g., those liable under a theory of *respondeat superior*) (alteration in original) (citation omitted)).

employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection with a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 555 (1997) (citation omitted). Here, the District Court rightly concluded that Fetter failed to satisfy the "second prong because his work on the ship 'did not regularly expose him to the special hazards and disadvantages of the sea.'" (App. at 27 (quoting *Matter of Buchanan Marine, L.P.*, 874 F.3d 356, 366 (2d Cir. 2017)).)

We agree that Fetter did not produce enough evidence to allow a reasonable juror to find that he was a Jones Act seaman. Fetter was hired to work aboard the MONTANA for one day while the ship was in port. He was not scheduled to go to sea, nor was he hired to sail aboard the ship when it got underway. He was hired solely to complete discrete repairs alongside other day engineers. Those undisputed facts demonstrate conclusively that Fetter was not a Jones Act seaman.[5]

III.   CONCLUSION

For the foregoing reasons, we will affirm the order of the District Court.

_____

[5] The fact that Maersk provided Fetter some limited maintenance and cure payments – a benefit typically reserved for seaman – does not alter our analysis of the undisputed facts. Immediately after testifying that Maersk paid him maintenance and cure, Fetter indicated that Maersk also attempted to pay him under the LHWCA.