**ANDREW MARTIN MARINE CORP.,
Halter Marine Services, Inc. and
Continental Insurance Co.**

v.

**STORK–WERKSPOOR DIESEL B.V. and
ABC Insurance Co.**

Civ. A. No. 78–170.

United States District Court,
E. D. Louisiana.

Dec. 6, 1979.

Alan Goodman, New Orleans, La., for plaintiffs Andrew Martin, Marine Corp. and Halter, Marine Services, Inc.

Francis Emmett, New Orleans, La., for plaintiff Continental Ins. Co.

Walter Carroll, Jr., New Orleans, La., for defendant Stork-Werkspoor Diesel.

SEAR, District Judge.

■ Andrew Martin Marine Corporation, et al. v. Stork-Werkspoor Diesel B.V., CA 77–3685, is an admiralty action for damages allegedly sustained by the plaintiffs, Halter Marine Services, Inc., Andrew Martin Marine Corporation, Andrew Martin International, N.V., and Continental Insurance Company, as the result of the defective manufacture, installation or testing of one of two diesel engines purchased from defendant, Stork-Werkspoor Diesel, B.V. for the M/V ANDREW MARTIN. Andrew Martin Marine Corporation, et al. v. Stork-Werkspoor Diesel, B.V., CA 78–170, is an action brought by the same plaintiffs for damages for the alleged negligent repair and supervision of reinstallation of the same engine by the defendant. In both cases, the defendant moved for a stay of the proceedings pending arbitration, pursuant to section 3 of the United States Arbitration Act, 9 U.S.C. § 3. Defendant contends that an arbitration clause in the confirmation of the purchase order for the engines fixes the forum where the dispute in CA 77–3685 must be resolved, and that a slightly different arbitration clause contained in a repair order designates the forum for CA 78–170. I denied the motion for a stay in CA 77–3685, and it is presently on appeal to the Fifth Circuit. Accordingly, I am without jurisdiction to enter any further order with regard to that case, although a discussion of it is relevant to a disposition of a similar motion in CA 78–170, which I now must resolve.

Plaintiffs' chief grounds for opposing the stay are the same in both cases: they contend that (1) they are not signatories to the contracts containing the arbitration clauses, and therefore are not bound by the clauses; and (2) even if they are deemed parties to the contracts, their claims sound solely in tort, and therefore are not susceptible to arbitration.

### Parties

The plaintiffs are Halter Marine Services, Inc. (Halter), the alleged owner of the M/V ANDREW MARTIN; Andrew Martin Marine Corporation (AMMC), the bareboat charterer of the vessel and its owner *pro hac vice*; Andrew Martin International, N.V., the sub-bareboat charterer; and Continental Insurance Company, the subrogated insurer of the vessel. The defendant is Stork-Werkspoor Diesel B.V. (SWD), who manufactured and repaired the engine.

### Facts

On May 31, 1974, Andrew Martin signed a "Confirmation of Order" for a diesel engine package to be manufactured by SWD and installed in the M/V ANDREW MARTIN, which Halter subsequently began building in mid-1975. The order reads, in part:

### CONFIRMATION OF ORDER

No. 91–USA:8954:74B

To: Martin Industries, Inc.—New Orleans

(M/V ANDREW MARTIN)

Re: Twin screw installation with non-reversible engines for a tug

Martin Industries—New Orleans (M.I.I.) hereby order officially and Stork-Werkspoor Diesel B.V.—Amsterdam (S.W.D.) confirm that they will supply to M.I.I. the following:

Two (2) main diesel engines

.        .        .        .        .

Payment conditions

.        .        .        .        .

These drafts to be accepted by Martin Industries, Inc. and signed for aval [sic] in behalf of drawee by Andrew Martin personally.

.        .        .        .        .

Signed on behalf of
MARTIN INDUSTRIES CO.
/s/ Andrew Martin

Signed on behalf of
STORK—WERKSPOOR
DIESEL B.V.
/s/ Jan van Dyk

(Underscoring mine.) One party to the contract is interchangeably referred to as "Martin Industries, Inc.," "Martin Industries," and "M.I.I.," and may be understood to be the same as the signatory, "Martin Industries Co." But all of the entities named, including "Martin Industries Co.," are nonexistent. However, Andrew Martin, the actual signer of the contract, testified at his deposition that he intended to sign the order on behalf of Andrew Martin Industries, Inc. (AMI), a Delaware corporation of which Martin is president and the owner of 94% of its stock.

Martin testified on deposition that at the time the order was signed, he intended to purchase the engines for still another nonexistent entity, Andrew Martin Marine Corporation (AMMC). AMMC was, however, incorporated in Louisiana one week following the confirmation of order on June 4, 1974. (Martin depo., CA 77–3685, Exhibit AM–R). More than a year following the actual purchase of the engines, on August 21, 1975, the board of directors of AMMC resolved that AMMC purchase the engines for the M/V ANDREW MARTIN from SWD, and authorized Andrew Martin to make the purchase and obligate AMMC for their payment. (Martin depo., CA 77–3685, Exhibit AM–B). There is, however, no evidence of an actual transfer of ownership of the engines from whoever their purchaser was to AMMC.

On the other hand, the evidence suggests that Martin attempted to assign the engines to Halter. At the bottom of a letter dated May 14, 1975, from D. J. Levine, vice president of Oosterhuis Industries, Inc., SWD's general agent in the United States, to William Imbert, treasurer of Halter, confirming the sale to "Martin Industries, Inc.," someone added what purports to be an assignment of the engines to Halter, dated September 16, 1975 and signed by Martin. The "assignment" reads:

New Orleans, Louisiana
September 16, 1975

Martin Industries, Inc. hereby assigns its interest in the above mentioned engines to Halter Marine Services, Inc.

MARTIN INDUSTRIES, INC.
BY: /s/ Andrew Martin
Andrew Martin, President

(Martin depo., CA 77–3685, Exhibit AM–E). Martin explained in his testimony that the M/V ANDREW MARTIN was to be built and financed by Halter, that AMMC would then charter it, and that the engine package would be assigned to Halter, "but the debt would resume to us." (Martin depo., CA 77–3685, p. 72–73.) It is unclear whether, by "us," Martin means AMMC or AMI. In fact, the "assignment" was made by the nonexistent "Martin Industries, Inc." The only evidence that Halter accepted this assignment is Martin's testimony; his September 16 notation on the May 14 letter is the only documentation of the "assignment" in the record. No mention was made of SWD's engine warranty and it was not attached to the "assignment." Moreover, Martin does not know whether Halter was ever given the confirmation of order containing the arbitration clause. When the engine casualty that lead to these lawsuits occurred, Halter was the owner of the engine package, according to Martin, but it is

unclear whether SWD ever knew of the "assignment" or whether Halter ever accepted it.

As for payment of the engines, Martin says a down payment was made, but does not remember "if I had made it or Halter made it. . . . If I made it, I think Halter reimbursed me somewheres, but I have to go check my record on that." The record reflects that AMI made a payment in November 1976, but that AMI owes AMMC for the amount. AMMC made a payment of $184,884.84 on the engines in April 1977, and there was never any settlement between the companies for this payment. In fact, Martin testified that revenue earned in the North Sea by the sub-bareboat charterer Andrew Martin International, N.V., comprises charter payments made to AMMC, and AMMC uses these to make payments on the engines.

Although it is Martin's testimony that Halter owned the engines, and that AMMC was responsible for payments on them, as recently as March 15, 1978 AMI and Andrew Martin, individually, agreed to their refinancing by a Netherlands credit corporation, Nederlandsche Credietverzerkering Maatschappij N.V. (NCM). (Martin depo., CA 77–3685, Exhibit AM–H.) AMI's board of directors authorized Andrew Martin to execute this agreement in a March 14, 1978 resolution. (Martin depo., CA 77–3685, Exhibit AM–H.) Martin explained in his testimony that NCM insisted on dealing with AMI rather than AMMC, although according to Martin, AMMC was the only corporation directly benefitting from the engine package. Yet there is no documentary evidence in the record indicating that AMMC owed any debt to AMI due to the refinancing.

After installation of the engines in the ANDREW MARTIN, the vessel underwent sea trials and then sailed from New Orleans to the North Sea oil fields, where the port engine sustained extensive damage on October 5, 1977. The damage, which allegedly was the result of SWD's defective and negligent manufacture of the engine, forms the basis of plaintiffs' claim in CA 77–3685.

When the failure occurred in the North Sea, an SWD representative was aboard the vessel and allegedly instructed that the vessel proceed to Amsterdam, Holland, where her port engine could be repaired at SWD's factory. The repairs were made pursuant to a work order signed on October 26, 1977, by SWD and Philip A. Thomassie, vice president of "A. Martin Industries, Inc.", still another nonexistent entity. The work order also contained an arbitration clause, although slightly different in language from that in the confirmation of order. In an affidavit, Thomassie calls himself vice president (foreign operations) of Andrew Martin Industries, Inc. However, Pieter Eltjo Dinkla, SWD's repair department manager, states in his affidavit that discussions leading to the execution of the work order were between SWD and "Martin Industries, Inc."

After its repair, the engine was reinstalled, allegedly under the direction, control and supervision of SWD, at an Amsterdam shipyard, Nederlandsche Dok en Scheepsbouw Mij (NDSM). Plaintiffs allege that work orders executed by SWD and NDSM do not contain arbitration clauses, but these orders are not yet in evidence. After reinstallation of the engine, the vessel left Amsterdam on November 25, 1977, arrived at the North Sea oil fields two days later, and on November 28, 1977, engine damage was discovered, resulting in the plaintiffs' claims in CA 78–170 for breach of warranty and negligent repair and reinstallation of the engine.

### Law

**(A)** *What law applies?*

Motions to stay in both cases are brought under section 3 of the Arbitration Act, which provides:

"If any suit . . . [is] brought . . . upon any issue referable to arbitration under an agreement in writing for such arbitration, the court . . . ., upon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, shall on application of one of the parties stay the

trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

9 U.S.C. § 3.

■ Written arbitration agreements in maritime transactions or transactions involving commerce are valid and enforceable. 9 U.S.C. § 2. The contracts at issue involve maritime transactions and, according to the terms of 9 U.S.C. § 1, they are transactions involving commerce. Therefore, the Arbitration Act applies. Where the Act applies, federal law governs questions of arbitration. *Tullis v. Kohlmeyer & Co.*, 551 F.2d 632, 638 (5th Cir. 1977).

(B) *Do the arbitration clauses bind the plaintiffs?*

■ Plaintiffs first contend that they are not bound by the arbitration clauses because none of them are signatories to the contracts in which the clauses are contained. If any of the plaintiffs are found to be bound by the contracts, then it does not matter that not all of them are bound; the action is stayed as to all of the parties pending arbitration of those claims that are referable to arbitration under the agreement. *C. Itoh & Co. (America) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228 (7th Cir. 1977); *Hilti, Inc. v. Oldach*, 392 F.2d 368 (1st Cir. 1968). *See Wick v. Atlantic Marine, Inc.*, 605 F.2d 166 (5th Cir. 1979); *Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679 (5th Cir. 1976).

■ Ordinary contract principles govern the question of who is bound by an arbitration agreement, and a party cannot be required to submit to arbitration any dispute that he has not agreed to submit. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 89 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). On the face of each contract, it is clear that none of the plaintiffs were parties to them. But the apparent manipulation of various corporate entities surrounding the events giving rise to these disputes makes this an appropriate case for examining the corporate integrity of AMMC to determine if it is bound to arbitration as the contract signatory's alter ego.

■ Because corporations are legal entities entitled to a presumption of separateness, their legal identities should not be lightly disregarded even if one corporation owns all the stock of another. *See, e. g., Overstreet v. Southern Ry. Co.*, 371 F.2d 411 (5th Cir. 1967). Here, plaintiffs, AMMC and Andrew Martin International, N.V., are wholly owned subsidiaries of AMI, the parent corporation. Andrew Martin owns 94% of the stock of AMI. He is the president of AMI, which he says is a holding company for its seven wholly owned subsidiaries, two of which are AMMC and Andrew Martin International, N.V. Martin is president of all of the subsidiaries. Nevertheless, under *Overstreet, supra*, the identity of corporate names, stockholders and officers, and the complete ownership of the capital stock of the subsidiary by the parent is not dispositive of the issue of whether the corporate veil should be pierced.

The Fifth Circuit has noted that although courts of equity "are reluctant to pierce the corporate veil and destroy the important fiction under which so much of the business of the country is conducted," they will do so "under such compelling circumstances as requires such action to avoid protecting fraud, or defeating public or private rights." *Fidelity & Dep. Co. of Md. v. USAFORM Hail Pool, Inc.*, 523 F.2d 744, 758 (5th Cir. 1975), *quoting Maule Industries v. Gerstel*, 232 F.2d 294, 297 (5th Cir. 1956). *Cf. Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976) (nonsignatory not bound to arbitration agreement without evidence that parent exercised its control over subsidiary to perpetrate fraud or something akin to fraud). In the present cases, if the corporate veil is not pierced, SWD's contractual right to arbitration will be defeated.

■ Whether the corporate form should be disregarded and the contract terms im-

puted to AMMC depends on the relationship between Andrew Martin, AMMC, and the other corporate entities involved here. The twelve factors to be considered were set forth in *Markow v. Alcock*, 356 F.2d 194, 197–98 (5th .Cir. 1966) and *Bay Sound Transportation Co. v. United States*, 350 F.Supp. 420 (S.D.Tex.1972), and I will apply them to the facts in these cases:

(1) *Common stock ownership.* Andrew Martin was the owner of 100% of the stock of each of the corporations that actually existed, except that he owned 94% of the stock of AMI, the corporation for which Martin claimed to be dealing. AMI owned 100% of the stock of AMMC and Andrew Martin International, N.V.

(2) *Common directors or officers.* Martin was the president of AMI and AMMC. He also acted for the nonexistent corporations. The remaining officers of AMI and AMMC were common to both corporations. There is no evidence there were other directors in common or whether there were in fact other directors.

(3) *Financing of the subsidiary by the parent.* AMI signed the· agreement to refinance the engines for AMMC and there is no evidence of a debt owed by AMMC to AMI. AMI also made a payment in November 1976 for which no settlement was ever made.

(4) *The incorporation of the subsidiary being caused by the parent.* AMI caused the incorporation of AMMC.

(5) *Grossly inadequate capital for the subsidiary.* There is no evidence of capitalization of either parent or subsidiary.

(6) *Payment by the parent of the salaries of the subsidiary.* There is no evidence regarding salaries paid by any of the corporations.

(7) *The subsidiary receiving no business except that given to it by the parent.* AMI arranged for the construction of the M/V ANDREW MARTIN and the contract with Halter before AMMC even came into existence. AMMC then became the bareboat charterer and another Andrew Martin corporation the subcharterer.

(8) *The parent using the subsidiary's property as its own.* The record simply is inconclusive as to who actually owned or paid for the engines that AMMC used.

(9) *Whether formal legal requirements were observed.* Martin swears that formal legal requirements were observed, but the record belies that assertion. There is no evidence or record of any debt between the corporations, and despite corporate authorization to purchase, sell, or finance, there is no evidence that any of the authorized acts were carried out. On the contrary, the clear evidence is that the board of directors of AMMC authorized Martin to purchase the engines in its behalf, but there is no evidence that AMI, if it indeed was the owner in the first place, authorized the sale. Moreover, there is no evidence that the resolution was ever carried out. Instead, the evidence is that Andrew Martin breached his authority and "assigned" the engines to Halter.

(10) *Whether the directors of one corporation acted in the independent and primary interest of the other.* Martin testified that AMI's corporate purpose was to be a holding company, and AMMC's purpose was to operate vessels. However, his testimony shows that he paid little attention to whose interest he was acting in and whether he had express corporate authorization to act. In the beginning, he had no express authorization from AMI to· obligate it to the purchase of the engines. He testified he intended to transfer them to AMMC after its incorporation. The facts support a finding that Andrew Martin acted for each entity as his particular interest was affected at that moment.

(11) *Whether the two operations were so integrated through the commingling of funds, interactivities and common direction and supervision that they should be considered as one enterprise.* Martin testified that separate bank accounts were maintained for each of his subsidiaries and for AMI, though there is no documentary evidence to support the assertion. AMMC and AMI had the same operating address, but different people were in charge of the day-

to-day operations of each corporation, according to Martin. The major decisions, however, were made by Martin. Martin testified that when he called on customers, he lumped all his companies together and referred to them as "Martin Industries."

(12) *Whether one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of the other.* Martin created AMMC to operate the M/V ANDREW MARTIN, and he intended that AMMC would pay for its engines. He said he informed SWD of this plan, but it was never actually carried out. As far as SWD knew, AMI still owned the engines and was responsible for their cost.

SWD agreed with someone that disputes arising out of the confirmation of order and the repair order would be submitted to arbitration, and it is entitled to rely on those agreements. Equity demands that the corporate forms be disregarded and that AMMC be deemed a party to the contracts.

Having determined that AMMC is a party to the contracts containing arbitration clauses, I must grant the requested stay if two conditions are satisfied: (1) the issue is one that is referable to arbitration under an agreement in writing for arbitration, and (2) the party applying for the stay is not in default in proceeding with arbitration. *See* 9 U.S.C. § 3.

(C) *Are the issues referable to arbitration under the agreements?*

The confirmation of order at issue in CA 77–3685 provides:

"Any dispute arising out of the Contract shall be finally settled, in accordance with the Rules of Concilliation [*sic*] and Arbitration of the International Chamber of Commerce, by one or more arbitrators designated in conformity with those rules."

The repair order at issue in CA 78–170 provides:

"Any disputes (including those which are regarded as such by only one of the parties) that should arise from the present agreement or from any other agreement resulting from same, shall be submitted to arbitration."

In both cases, plaintiffs claim damages for defendant's breach of warranty and negligence. Thus, I must determine, in CA 78–170, whether the contract and tort claims are disputes that "arise from the present agreement or from any other agreement resulting from same," under the repair order language. Because my previous resolution of the motion for a stay in CA 77–3685 is on appeal to the Fifth Circuit, I am without jurisdiction to enter an order deciding whether, in that case, the contract and tort claims are disputes "arising out of the Contract," under the confirmation of order language.

In my minute entry in 77–3685, I said, and I maintain correctly, that a maritime tort action lies for negligent design and manufacture and for negligent breach of warranty with respect to the construction of vessels, even if damage only to chattel, and not personal injury, is alleged, citing *Jig Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *cert. denied sub nom. Atlantic Marine, Inc. v. Jig III Corp.*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). It is also true, for purposes of CA 78–170, that the negligent breach of a contract to repair a vessel sounds in tort. *Alcoa Steamship Co. v. Charles Ferran & Co.*, 242 F.Supp. 962, 973 (E.D.La.1965), *aff'd*, 383 F.2d 46 (5th Cir. 1967). However, in CA 77–3685, I relied on *Jig Third, supra*, to rule that because the arbitration clause at issue covered "dispute[s] arising out of the Contract" and did not specifically refer to "negligence" or "tort", the plaintiffs need not submit their tort claim to arbitration. My reliance on *Jig Third* was misplaced.

In *Jig Third*, a shrimp boat sank, and its owners sued the vessel's manufacturer, advancing three theories of recovery: One in contract (breach of warranty) and two in tort (negligent design and construction and strict liability). The jury found that the boat sank because of a defect in its design or construction, and that the manufacturer

was negligent. The manufacturer, on appeal, argued that the owners' remedy must be found within the four corners of the contract of sale, and that their loss did not fall within the ambit of the contractual warranty.

The Fifth Circuit simply held that the owners had a cause of action in tort. The court then noted that when parties are of relatively equal bargaining power, the seller may disclaim liability for damage to the product sold that results from negligent design or manufacture. Even so, the court held that for such contractual disclaimers to be enforceable, they must be clear and unequivocal, specifically mentioning "negligence," "tort," or "cognates thereof." 519 F.2d at 176–77. The disclaimer at issue in *Jig Third* did not contain those words, so the court held that tort liability had not been waived and evidence of negligent design and manufacture was properly submitted to the jury.

▪ The present cases do not involve the waiver of a right to recover in tort. Rather, they involve the question of whether, under the arbitration clauses, plaintiffs' tort claims are subject to arbitration. Whether the contracts also contain language that clearly and unequivocally waives plaintiffs' right to recover in tort is a question for the arbitrator, not for me.

▪ The rules for interpretation of warranty disclaimers and those for deciding the applicability of arbitration clauses are different. The Fifth Circuit held in *Seaboard Coast Line R.R. Co. v. Nat'l Rail Pass. Corp.*, 554 F.2d 657, 660 (5th Cir. 1977) that where an agreement contains an arbitration clause, a stay should be granted on appropriate motion

"unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

*quoting United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 582–83, 80 S.Ct. 1343, 1353, 4 L.Ed.2d 1403 (1960). *Accord, Wick v. Atlantic Marine,* 605 F.2d 166 (5th Cir. 1979). In *Acevedo*

*Maldonado v. PPG Industries, Inc.,* 514 F.2d 614 (1st Cir. 1975), a provision in a construction contract stated that "any controversy or claim arising out of or related to this Agreement" shall be arbitrated. *Id.* at 616. There, plaintiff/employee was injured by the escape of chlorine gas in defendant/employer's factory. Defendant filed a third-party complaint for contribution from the designer/builder of the factory. The third-party defendant moved for a stay pending arbitration based on that clause, and the court, in ordering the stay, said:

"[B]road language of this nature covers contract-generated or contract-related disputes between the parties however labeled; it is immaterial whether claims are in contract or in tort, or are couched in terms of the contribution owed by one tortfeasor to another."

*Id. Accord, Tac Travel America Corp. v. World Airways, Inc.,* 443 F.Supp. 825 (S.D. N.Y.1978) (party cannot avoid agreement to arbitrate by labeling breach of contract claim a tort claim).

Here, the parties agreed in writing to submit to arbitration "[a]ny dispute arising out of the Contract" (clause in purchase order confirmation) and "[a]ny disputes . . . that should arise from the present agreement or from any other agreement resulting from same" (clause in work order). The alleged wrongs sound in tort, but they also sound in contract. *See* Prosser, The Law of Torts § 95 (4th ed. 1971); *Jig Third, supra.* It cannot be said "with positive assurance" that these arbitration clauses are not susceptible of an interpretation that covers the asserted disputes. *Seaboard Coast Line R.R. Co., supra.* Furthermore, in *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 522 n. 15, 94 S.Ct. 2449, 2457–58 n. 15, 41 L.Ed.2d 270 (1974), the Supreme Court noted that Congress passed Chapter 2 of the United States Arbitration Act, 9 U.S.C. § 201 *et seq.,* to implement the United Nations Economic and Social Council's adoption of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Convention provides, in Article II(1), that:

"Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all *or any differences which have* arisen or which may arise between them in respect of a defined legal relationship, *whether contractual or not,* concerning a subject matter capable of settlement by arbitration."

(Emphasis supplied.)

In view of the policy of the Arbitration Act to "encourage arbitration and to relieve congestion in the courts," *Seaboard Coast Line R.R. Co., supra,* at 660, the claims here should be submitted to arbitration. To extend the *Jig Third* requirements for tort liability disclaimers to the context of the applicability of arbitration provisions is unwarranted.

In CA 78–170, plaintiffs also contend that their dispute is not one referable to arbitration because the repair order itself is unenforceable as against public policy, due to the "vast disparity in the bargaining positions of the parties." This argument is untenable.

■ The enforceability of arbitration clauses is governed exclusively by the explicit provisions of the Arbitration Act, 9 U.S.C. §§ 1–14. *Sam Reisfeld & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 680–81 (5th Cir. 1976). Under section 2 of the Act, a party seeking to avoid arbitration must allege and prove that the arbitration clause itself was a product of fraud, coercion, or "such grounds as exist at law or in equity for the revocation of any contract." This is a stringent standard. *See id.* at 681.

■ Plaintiffs simply allege that the repair order amounted to a contract of adhesion, because when the M/V ANDREW MARTIN had engine trouble in the North Sea, SWD was the only qualified company in the area to repair it. Certainly plaintiffs knew when they contracted to purchase the engine package that it would be put into the M/V ANDREW MARTIN, which would operate in the North Sea. Presumably they also knew that if the engines failed, SWD would be the company to turn to for repairs. It is normal practice to return defective goods to their manufacturer.

■ Plaintiffs also allege that they did not read the contract and therefore should not be bound by its terms. The failure to read a contract is almost never grounds for revoking a contract, and it certainly should not be here where plaintiffs' attorney was present during the negotiations for the repair order.

■ Plaintiffs also urge, in CA 78–170, that they are claiming, in addition to their allegation of negligent repair, that SWD negligently supervised NDSM's reinstallation of the engine in the M/V ANDREW MARTIN. They argue that the issue of negligent reinstallation is not referable to arbitration under the repair order. They contend that they are third party beneficiaries to the installation agreements between SWD and the installer, NDSM, and that these agreements do not contain arbitration clauses.

The language of the arbitration clause in the repair order refutes plaintiffs' argument. It provides:

"Any disputes . . . that should arise from the present agreement *or from any other agreement resulting from same,* shall be submitted to arbitration."

(Emphasis supplied.) Plaintiffs' claim of negligent supervision of reinstallation is one that is referable to arbitration under the repair order because SWD's installation agreements with NDSM are agreements "resulting from" the repair order. Therefore, plaintiffs' argument is without merit.

(D) *Is SWD in default in proceeding with arbitration?*

■ In CA 77–3685, plaintiffs contended that by participating in the lawsuit, SWD waived its right to arbitration. The Fifth Circuit has held that some activity in a lawsuit does not constitute a waiver of a right to arbitrate. For example, in *General Guaranty Ins. Co. v. New Orleans General Agency, Inc.,* 427 F.2d 924 (5th Cir. 1970), the court held that a defendant who had pleaded alternatively that a contract containing an arbitration clause had been

abandoned, and that the proceedings should be stayed pending arbitration, did not waive its right to arbitration. The defendant's subsequent filing of a counterclaim, attempt to implead a third person, allowing plaintiff to take depositions, and failure to appeal an order denying its motion for summary judgment on the abandonment issue were held not to constitute waiver. Although CA 77-3685 differs from *General Guaranty* in that SWD's answer did not raise the arbitration clause as an affirmative defense, that omission should not constitute waiver. SWD, at a status conference held the day after its attorney learned of the existence of the arbitration agreement, announced that it would file a motion for a stay. That conference was only thirty-eight days after the commencement of the lawsuit. The short delay before SWD moved for a stay is understandable because counsel had to establish communication with his client in Holland. SWD's only other actions prior to the conference were a request for production corresponding to plaintiffs' request, and its successful motion for a protective order to prevent plaintiffs' destruction of evidence through metallurgical tests.

The Second Circuit has held that as much as a two-year delay in proceeding with arbitration is insufficient to waive arbitration unless actual prejudice is shown; participation in a lawsuit does not, standing alone, constitute waiver. *Carcich v. Rederi A/B Nordie*, 389 F.2d 692 (2d Cir. 1968). In view of the overriding federal policy favoring arbitration, waivers are not lightly inferred. *Id.* Here, defendant's very short delay before filing its motion for a stay should not be deemed to constitute waiver. The plaintiffs were not thereby prejudiced in their ability to present their claim to an arbitrator.

Accordingly, defendant's motion to stay pending arbitration is GRANTED.