**NORTH PACIFIC STEAMSHIP COMPANY, Plaintiff,**

v.

**PYRAMID VENTURES GROUP, INC., Pyramid Bulkhandling, Inc., Hellenic, Inc., Donald C. Scafidi and Peter V. Guarisco, Defendants.**

**Civ. A. No. 74–1371.**

United States District Court, E.D. Louisiana.

Sept. 15, 1983.

Bruce MacGregor Hall, Portland, Or., Ashton R. Hardy, New Orleans, La., for plaintiff.

Charles Kohlmeyer, Jr., New Orleans, La., for defendants.

## OPINION

CASSIBRY, District Judge:

This case was tried before the Court sitting without a jury in late April and early May of 1983. At the conclusion of the trial, the Court directed the parties to submit post-trial memoranda; the final submission was received on August 5, 1983. After considering the parties' memoranda, and after sifting through the voluminous amount of exhibits in this case, the Court now renders its opinion.

### A.

### FACTS

I. PARTIES, PARTICIPANTS, AND JURISDICTION

A brief scorecard seems useful at the outset. The plaintiff, North Pacific Steamship Company ("North Pacific"), was at all times pertinent to this litigation a Liberian corporation engaged in the shipping business.[1] The four defendants are: Peter Guarisco, a Louisiana resident who was the moving force behind the corporations involved in this lawsuit; Donald Scafidi, a Louisiana resident and Guarisco's "operations officer" for some of his corporations; Hellenic, Inc. ("Hellenic"), a closely-held family corporation of which Guarisco was the dominant stockholder; and Pyramid Ventures Group, Inc. ("Ventures"), a Louisiana corporation whose genesis in 1969 marked the beginning of Guarisco's and

---

**1.** North Pacific has now been merged into Trans-Pacific Shipping Company. Out of an abundance of caution, I granted the plaintiff's motion to add Trans-Pacific as a plaintiff to insure the proper party is before the Court, though the merger agreement and Liberian law seem to allow North Pacific to maintain this lawsuit in its own name.

Scafidi's combined ventures in the shipping industry.

In addition to these parties, three other corporations are entwined in the intricate web of this case: Pyramid Bulkcarriers, Inc. ("Bulkcarriers"), Pyramid Bulkhandling, Inc. ("Bulkhandling"), and Transbulk, Inc. ("Transbulk"). In their shipping operations, these companies utilized Ventures as their managing agent and, together with Ventures, they comprise "the Pyramid group", as referred to in this opinion.

The jurisdiction of this Court rests on diversity of citizenship and is uncontested.

## II. BACKGROUND

In 1969, some years after Peter Guarisco had come into contact with Donald Scafidi, the two men decided to direct their efforts toward the transportation by sea of bulk cargoes. To that end, they first formed Ventures and Bulkcarriers. Ventures was incorporated in Louisiana in April of 1969; its stock was held almost exclusively by Guarisco and his childrens' trusts. Bulkcarriers was a Liberian corporation formed in July of 1969, and its stock was split initially between Hellenic and Garvey International, a customer of Bulkcarriers.

Hellenic (originally Twenty Grand, Inc.) had been incorporated in 1946. It was and remains a closely-held family corporation of diversified interests with substantially all of its stock owned of record or beneficially by members of the Guarisco family.

Through 1969 and into 1970, Bulkcarriers proved to be quite successful; a number of vessels were chartered and used by it in its operations. Its field of operations was primarily the Gulf and Caribbean. During this relatively uneventful time, Bulkhandling was incorporated in Liberia in March of 1970; however, it operated no vessels and was essentially inactive. In May of 1970, Garvey International sold its interest in Bulkcarriers to Bulkcarriers, thus leaving the company a wholly-owned subsidiary of Hellenic.

Enter North Pacific. Earlier, North Pacific had purchased two self-unloading vessels in which Guarisco and Scafidi had been interested. In the fall of 1970, Scafidi and Richard Tedesco, an employee of Ventures as agent for Bulkcarriers, negotiated with plaintiff for time charters of these vessels, the PACSEA and the PACSUN. The charters were entered into on November 24, 1970.

The PACSEA and PACSUN were put into service quickly and, just as quickly, disputes arose. Alleging poor performance of crews and vessels, Bulkcarriers began to deduct from charter hire payments to North Pacific amounts reflecting losses sustained by it as a result of these alleged deficiencies. North Pacific countered by claiming breach of contract, taking the matter to arbitration, and garnishing Bulkcarriers' bank account at the Whitney Bank in New Orleans on June 10, 1971. In order to free Bulkcarriers' account, Guarisco posted a $115,000 bond, which he personally signed as indemnitor. At the same time, David Graf, Guarisco's brother-in-law, instructed the Whitney Bank to keep the Ventures' account in a continuously overdrawn position and to cover the overdrafts daily with funds from Bulkcarriers' account.

With the ball in Bulkcarriers' court (and, most significantly, the time charter market in a dreadful slump), Scafidi, acting with Guarisco's approval, sent North Pacific a telex on June 30, 1971, advising plaintiff of Bulkcarriers' repudiation of the PACSEA and PACSUN charters. Whether the repudiation was justifiable was included as an issue in the ongoing arbitration proceedings. On December 8, 1972, the arbitration culminated in an arbitration award in favor of North Pacific and against Bulkcarriers. On May 8, 1973, the award was affirmed in a judgment of this Court in the amount of $842,350.67. Of that amount, plaintiff has recovered $117,540.82, which leaves a balance against Bulkcarriers of $724,809.85.

Whether that judgment can be recovered against any of the four defendants named herein forms the subject matter of this lawsuit. Plaintiff contends that, by virtue of the nexus of individual and corporate

relationships and in light of a series of improper machinations yet to be discussed, I should "see through" the corporate fiction of Bulkcarriers and find Guarisco, Scafidi, Hellenic, or Ventures—or all—liable for Bulkcarriers' debt. Not surprisingly, defendants contend that no veil needs piercing in this case, that corporations may be and are formed to limit liability, and that if Bulkcarriers happens to be judgment-proof (as it is), then North Pacific is simply poorer but, nonetheless, wiser.

To understand plaintiff's contentions requires examination of a series of events that took place after the June 30, 1971 rescission by Bulkcarriers. Before doing so, however, I note that the disputes in this case were not primarily over the facts themselves, but over their interpretation. Plaintiff urged me to view every action taken by defendants and by the Pyramid group after June 30, 1971 as attempts to divert corporate opportunities improperly from Bulkcarriers so as to escape possible exposure to a debt of nearly $750,000. In opposition, defendants urged me to consider the same actions as necessary steps taken to satisfy customers or as business decisions wholly unrelated to the North Pacific affair. For the most part, I have found plaintiff's interpretation far more plausible and credible.

### III. JULY, 1971—OCTOBER, 1972: THE HANS CHRISTOPHERSON AND THE AZTECA

Shortly after Bulkcarriers' rescission of the PACSEA and PACSUN charters, on July 7, 1971, Ventures chartered the HANS CHRISTOPHERSON—not as agent for Bulkcarriers, but for itself. At this time, Bulkcarriers was the only active shipping company in the Pyramid group. The charter of the HANS CHRISTOPHERSON was the first and only charter negotiated by Ventures for itself, and the profit realized from the ship's voyages was in excess of $100,000.

Subsequently, in July of 1971, Ventures entered into negotiations with a Mexican shipowning company for the chartering of the vessel AZTECA. The representative of the shipowners, Barry Register, testified that the ship was originally being chartered for Bulkcarriers. However, after the owners had signed the charter with "Bulkcarriers" written in as charterer, Scafidi crossed out "Bulkcarriers" and replaced it with "Bulkhandling". The charter was executed on August 4, 1971, and all addenda to the charter evince the same deletion and addition. The corporate minutes of Bulkhandling reflect that Ventures was not authorized to act as agent for Bulkhandling until November 8, 1971. From October, 1971 to October, 1972, Bulkcarriers assigned sixteen (16) cargoes over to Bulkhandling to be carried on board the AZTECA; these assignments were made without consideration.

### IV. DISCUSSION

To put the HANS CHRISTOPHERSON charter and the AZTECA charter and assignments in perspective, it is useful to adduce additional facts that do not lend themselves to any neat chronological order. The first of these concerns the organization of the Pyramid group. By October, 1972, the quartet was complete: Ventures, Bulkcarriers, Bulkhandling, and Transbulk (the last having been incorporated in September, 1972 as a Bahamian corporation). The "Bulk" trio were the shipping companies; however, as agent, Ventures arranged and handled all of their business affairs. Furthermore, to quote from plaintiff's brief, "The shipping entities ..., without paid employees or paid officers, without ship ownership or crews, and without any management, were totally dependent upon Ventures for receipt of business and operations".[2] Thus, Bulkcarriers, Bulkhandling and Transbulk, as a factual matter, were completely under Ventures' control.

And Ventures? Ventures was entirely controlled by Guarisco and Scafidi. In an appendix to this opinion, I have set out fully the myriad connections between three

---

2. Plaintiff's opening Post-Trial Brief, p. 9.

men—Guarisco, Scafidi, and David Graf— and the corporations involved in this case. Those connections, in conjunction with the testimony and exhibits offered at trial, plainly reveal that the day-to-day affairs of the Pyramid group were Scafidi's responsibility and that all important decisions were made by Scafidi and Guarisco, with Guarisco casting the deciding vote. (As stated earlier, Graf was Guarisco's brother-in-law and his participation in corporate decisions was pro forma at most).

In possession of these facts, I turn again to the HANS CHRISTOPHERSON. On the one hand, defendants explained the charter's placement with Ventures by stating that "The carriage of small patrol boats to Africa was never intended to be a Bulkcarriers' contract because it was not the type of work Bulkcarriers performed".[3] However, Bulkcarriers' "work" was in no way limited to the Gulf and Caribbean (though the vast majority of its work had been performed in these seas). Moreover, Bulkcarriers, as an active shipping company, was far more suited to the task than Ventures, a shipping agent which had never before hauled bulk cargo. More suited, that is, so long as the corporate fictions were observed.

Defendants' alternate explanation came from Scafidi: "I owned thirty percent of Pyramid Ventures Group and I didn't own anything else and I had done all the work on it and that's the story".[4] Rather than a satisfactory explanation, however, Scafidi's remarks are an admission of impropriety and an illustration of the "hat" problems that soon developed after Bulkcarriers' difficulties ensued. In July, 1971, Scafidi was the president, a director and a 4% shareholder of Bulkcarriers (thus impeaching his claim of "not owning anything else"). He was also the president, a director and a 33.6% shareholder of Ventures. Were there no connection between Ventures and Bulkcarriers, it might have been unobjectionable for Scafidi to choose his Ventures "hat" in the HANS CHRISTOPHERSON transac-

tion. However, in light of the agent/principal relationship between Ventures and Bulkcarriers and in light of Scafidi's legal duty to represent Bulkcarriers' interest, the signing of the charter for Ventures *qua* Ventures was wholly improper—an unmitigated diversion of corporate opportunity. Again, Bulkcarriers was the shipping arm of the Pyramid group, not Ventures, and the HANS CHRISTOPHERSON episode marks the first attempt by defendants to divert assets from its potential judgment-debtor corporation, Bulkcarriers.

As to the AZTECA, defendants contend that the switch to Bulkhandling and the subsequent assignments by Bulkcarriers were necessitated by customer demands to deal with a "clean" company. Yet, the Pre-Trial Order states as an uncontested fact: "Defendants do not recall any particular vessel owners refusing to charter vessels to Pyramid Bulkcarriers, Inc." This statement flies in the face of defendants' contentions. At trial, the defense claimed that Protinal, their best customer, insisted upon dealing with Bulkhandling. However, they offered no credible evidence in support of this claim and, given that Protinal would have been dealing with precisely the same people and that no judgment was entered against Bulkcarriers until December of 1972, the claim makes little sense.

What the evidence did support was the fact that Guarisco and Scafidi, seeing the harbinger of a massive judgment against Bulkcarriers on the horizon, simply shifted the lucrative AZTECA charter to Bulkhandling and then assigned a number of Bulkcarriers' cargo contracts to that vessel. Both ends of the assignments, the requests by Bulkcarriers and the acceptances by Bulkhandling, were drafted in Louisiana by Scafidi, who would mail the documents to Bermuda for signature by an agent of Bulkcarriers and then sign them himself for Bulkhandling (Exhibits 86–215). It bears repeating how little effort was required to shift the shipping business of Bulkcarriers to Bulkhandling (and, in part, to Trans-

---

3. Defendants' Post-Trial Memorandum, p. 49.

4. Scafidi Tr., May 2, 1983, at p. 25–6.

bulk): all these transactions took place in Ventures' office. Indeed, defendants' effort was minimal. Exhibits 66–85 are letters which indicate, first, that a number of customers were never informed of their cargo's assignment to Bulkhandling and, second, that Bulkcarriers continued to correspond with them during October, 1971—October, 1972 as if it had retained their contracts. As with the HANS CHRISTOPHERSON, the only thing required to shift the corporate opportunity from Bulkcarriers was the paperwork in Ventures' office; Bulkcarriers had no voice in the matter. The only credible reason for the shift is the defendants' recognition that Bulkcarriers might soon be hampered by a large judgment.

In sum, I find as a fact that, in handling the HANS CHRISTOPHERSON and AZTECA transactions, Guarisco and Scafidi attempted to sidestep any potential obligation to North Pacific by the expedient, costless method of diverting corporate opportunities from Bulkcarriers to other companies under their control.

## V. AFTER THE ARBITRATION AWARD

As mentioned, the arbitration award was entered on December 8, 1972. By this time, Bulkcarriers had ceased doing business. Nevertheless, plaintiff contends that certain events continued the defendants' scheme to avoid the consequences of the judgment against Bulkcarriers. I take these up in turn, and discuss their relevance below.

In early 1973, Scafidi formed a new shipping venture, the Creole companies. Apparently, Transbulk helped to secure a loan for these companies by chartering a Creole vessel, which gave Creole something of value by which to obtain a bank loan. Transbulk then entered into several contracts of affreightment and, in August of 1973, assigned these contracts to Creole. During this time, Guarisco bought one-third of Creole's stock for $100; he sold his stock some months later for $150,000.

This Court's judgment against Bulkcarriers was entered on May 8, 1973. In September, Hellenic, which had acquired complete ownership of Bulkhandling's stock for $1000, sold nine of the ten shares back to Bulkhandling for $170,000. It sold the remaining share to Ventures for $18,900. Simultaneously, Hellenic made a loan to Bulkhandling of $150,000.

By 1974, Guarisco had sold his interest in Scafidi's Creole companies, and Ventures had withdrawn as their managing agent. Creole owed Ventures approximately $200,-000. On November 21, 1974, Guarisco, as chairman of the board of Ventures, wrote Scafidi, as president of Pyramid Marine (Creole's new agent), and demanded the repayment of the then-outstanding balance of $177,688.95. In the letter, Guarisco went on to say:

> Don, as I pointed out in my letter, the Pyramid Ventures Group, Inc. companies have no reason to be financing the Pyramid Marine, Inc. or Creole companies, and I feel strongly that this should be corrected promptly.

On February 26, 1975, Ventures loaned Scafidi $270,000, which amount Scafidi used to buy more stock in Creole and which was then used by Creole to retire its debt to Ventures. Though the loan was fully documented, plaintiff contends that Ventures improperly obtained the money necessary to make the Scafidi loan by pledging two $150,000 certificates of deposit held by Transbulk and Bulkhandling. The loan to Scafidi remains unpaid to this date.

The final assault by plaintiff on the defendants' actions concerns the fact that legal fees for all defendants have been paid by Ventures. This case has been tried once before, in Oregon, where it was ultimately vacated by the Supreme Court of Oregon for lack of jurisdiction, and, apparently, all fees have been paid by Ventures alone. At present, Ventures, Bulkhandling, and Transbulk are in receivership in Louisiana. The companies ceased shipping operations in mid-1974.

## B.

### THE LAW

Plaintiff articulates two legal theories in support of its claim that the four defendants should be held liable for the full amount of the judgment against Bulkcarriers. The first of these leads up to the dizzying heights of legal metaphor and into the world of "pierced veils," "alter egos" and "mere instrumentalities".

### I. AT VEIL'S EDGE

■ Indisputably, corporations may be and are organized to limit the organizer's liability. It is also true that, "in an appropriate case, the doctrine of 'alter ego' (or 'piercing the corporate veil')[5] may be applied". *Bordagain Shipping Co. v. Saudi-American Lines, S.A.,* 1979 A.M.C. 1058, 1071 (E.D.La.1978), *aff'd per curiam,* 623 F.2d 710 (5th Cir.1980). In *Baker v. Raymond International, Inc.,* 656 F.2d 173, 179 (5th Cir.1981), Judge Rubin forthrightly explained the problems involved in recognizing the "appropriate" case, while sketching in the basic framework for analysis:

> Beyond the commonplace that the Courts will ignore the principle of limited liability when "the justice of the case" requires, . . . there appears to be no encompassing doctrinal basis for determining when principals will be liable for the obligations of the corporations they control. At best, we can but list exemplars. If a controlling stockholder used a closed corporation as his personal business conduit, he may be held responsible for the debts of his "alter ego" . . . A parent corporation may be held liable for the debts of a subsidiary if the parent fails to observe the formalities of separate incorporation, including adequate capitalization of the subsidiary . . . If the corporation is employed to perpetrate a fraud upon a creditor, he may impose liability on its stockholders . . . Finally, a principal (usually a parent corporation) may so dominate the activities of a corporation that it is

necessary to treat the dominated corporation as an agent of the principal.

Louisiana law adds this gloss: "The situation must be viewed with regard to the totality of circumstances in each case" and "this principle of limited liability should be disregarded in only exceptional circumstances." *Kingsman Enterprises v. Bakerfield Electric Co.,* 339 So.2d 1280, 1283 (La. App. 1st Cir.1976).

In analyzing the facts of this case, I begin with two points of departure. First, no fraud is involved here. Plaintiff did not plead fraud and, if intended, they did not prove it. Plaintiff's representatives were sophisticated businessmen. In dealing with defendants, they understood themselves to be contracting with Bulkcarriers alone. The evidence did not indicate whether guarantees by Hellenic or Guarisco were ever sought by North Pacific; if they were, they were not given.

Secondly, however, if the "interest of justice" holds any meaning in this context, it fairly demands that I find some or all of these defendants liable. My reason for making such a bold statement stems from the premier fact of this case: when Bulkcarriers repudiated its contract with plaintiff, it was a viable, moneymaking enterprise. Yet, by the time of the arbitration award, though precisely the same *enterprise* was continuing to be viable and to make money, and though that enterprise was controlled by precisely the same people, Bulkcarriers had nearly evanesced . . . vanished into thin air. Without a sale, a merger, a declaration of bankruptcy, or any other legal form of corporate dissolution, Bulkcarriers had essentially dissolved. It did so through the corporate manipulations of two men—Donald Scafidi acting with the approval of Peter Guarisco.

### II. BEHIND THE VEIL: THE PYRAMID GROUP

The factual evidence demonstrates that the four companies known as the Pyramid group were actually one enterprise. The

---

**5.** "These gnomic phrases are used interchangeably, although literally they suggest different concepts." *Baker v. Raymond International, Inc.,* 656 F.2d 173, 179, at note 5 (5th Cir.1981).

enterprise, of course, was Ventures. Bulk-carriers, Bulkhandling, and Transbulk had no offices or employees. All of the functions that would ordinarily be performed by the office portion of an operating corporation were performed by Ventures as agent for these companies. Control of the Pyramid group was vested completely in Guarisco and Scafidi. Scafidi was a director and officer of each company; Guarisco was a director of each and president of Ventures. Either directly or indirectly, Guarisco had at least majority control of the stock of each company and, through Hellenic, he controlled the purse as well.

■ To be sure, nothing said so far is necessarily ominous. Control is not the equivalent of a "mere instrumentality", as defined in the law. To rise to that level, control must amount "to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.,* 483 F.2d 1098, 1106 (5th Cir.1973), *modified per curiam,* 490 F.2d 916 (5th Cir.1974).

■ I find this is precisely what happened to Bulkcarriers after June of 1971. Having turned back the PACSEA and PACSUN, Bulkcarriers rather suddenly lost its separate existence. Though no customers refused to deal with Bulkcarriers, and through no fault of its own, the company lost two lucrative charters—to its own agent and to a previously inactive corporation. It lost these charters because Scafidi and Guarisco perceived the looming encumbrance of a judgment against Bulkcarriers

and saw a simple, but seemingly effective, means of avoidance. Disregarding the agent/principal relationship between Ventures and Bulkcarriers, the two men gave the HANS CHRISTOPHERSON charter to Ventures. Disregarding the fact that Ventures had negotiated the AZTECA for Bulkcarriers and that Ventures was not even authorized to act as agent for Bulkhandling, they gave the AZTECA to Bulkhandling. Then, for no consideration, Scafidi shifted a number of valuable assignments away from Bulkcarriers to Bulkhandling. In these and in later transactions, Ventures, Bulkhandling, and Transbulk paid nothing for the use of Bulkcarriers' goodwill and reputation, assets which they must have utilized to obtain contracts since they had previously chartered no boats on their own. With an egregious disregard for the independent corporate interest of Bulkcarriers and in an effort to render Bulkcarriers judgment-proof, while still maintaining that company's business and losing none of its assets, Scafidi and Guarisco shifted operations among these companies as if they were one.[6] The interest of justice requires that I treat them no differently; hence, I find the corporate veil of Bulkcarriers should be pierced to reach the dominant corporation, Ventures.

### III. BEHIND THE VEIL: HELLENIC AND GUARISCO

■ In considering whether the veil of Bulkcarriers should also be lifted to expose Hellenic or Guarisco himself,[7] I have applied the list of factors enumerated in *Andrew Martin Marine v. Stork-Werkspoor Diesel,* 480 F.Supp. 1270 (E.D.La.1979).[8]

---

**6.** Furthermore, by 1975, it seems that even Ventures had lost its separate corporate interest, as evinced by its loan to Scafidi of $270,000. Defendants contend that this loan made corporate sense in that it enabled Creole to pay its $170,000 loan back to Ventures, but common sense (and hindsight) suggest otherwise. Ventures replaced a $170,000 loan to Creole with a $270,000 personal loan to Scafidi—secured by a second mortgage on his home and the pledge of his Ventures stock—which remains wholly unpaid to the date of trial.

**7.** In its briefs, for whatever reason, plaintiff does not vigorously pursue defendant Scafidi, and I have concluded that he is not personally liable. Though in charge of a great many operations, Scafidi was at all times under Guarisco's—his employer's—control.

**8.** The twelve factors are:
(1) Common stock ownership;
(2) Common directors or officers;
(3) Financing of the subsidiary by the parent;
(4) The incorporation of the subsidiary being caused by the parent;

Although no one factor or set of factors is necessarily decisive, they have served as useful guidelines for my inquiry.

■ First, Guarisco. Clearly, he controlled these corporations, but I have not found the requisite degree of commingling of individual and corporate assets to hold him personally responsible. While it is true that he signed millions of dollars worth of checks for the Pyramid group and that loans from Hellenic would pass through him to Ventures and back again, it is also true that he was authorized to sign these checks and that the loan transactions were fully documented. My research has indicated that a finding of individual liability for corporate debts generally rests on a pervasive blurring of the individual and corporate identities, not merely the fact of control or the fact that a corporation is operated in an individual's interest.[9] *See, e.g., Talen's Landing, Inc. v. M/V Venture*, 656 F.2d 1157 (5th Cir.1981). As I stated earlier, North Pacific received no personal guarantee from Guarisco in its dealings with Bulkcarriers and Guarisco's subsequent actions, including the Creole transaction, do not warrant the judicial imposition of such a result.

■ With Hellenic, the issue is closer. Guarisco controlled both Hellenic and Bulkcarriers through his stock ownership of Hellenic. Hellenic incorporated Bulkcarriers, and guaranteed its line of credit, first $75,000, then $500,000. Bulkcarriers' initial capitalization was $2000, which seemed somewhat meager in light of the value of Bulkcarriers' operations.

On the other hand, Bulkcarriers received its business from Ventures and its shipping operations were conducted by Ventures, not Hellenic. In addition, Bulkcarriers observed formal legal requirements: its capitalization was legally sufficient; it kept separate accounts, elected boards of directors, and recorded corporate minutes. Though Bulkcarriers' assets swirled within the Pyramid group, Hellenic was not at the time a party to these diversions.

Nevertheless, Hellenic did take one action which I find to be a deliberate attempt to strip the Pyramid group of assets: the September, 1973 stock sale to Bulkhandling and Ventures. The judgment of this Court against Bulkcarriers was entered on May 18, 1973. Then, in September, Hellenic sold nine of Bulkhandling's ten shares to Bulkhandling for $170,000 and the remaining share to Ventures for $18,900. Ostensibly, this action was taken because Hellenic wanted "out of the shipping business" (if that phrase has any meaning in light of Guarisco's and Scafidi's control of all of these corporations). Yet, immediately thereafter, Hellenic loaned Bulkhandling $150,000. The underlying intention of the stock sale is patently obvious—to remove funds from beyond the reach of North Pacific as that creditor began, through judgment debtor proceedings, to investigate what had happened to Bulkcarriers' business and assets. No other corporate purpose presents itself, for Hellenic was a multi-million dollar corporation, while Bulkhan-

(5) Grossly inadequate capital for the subsidiary;
(6) Payment by the parent of the salaries of the subsidiary;
(7) The subsidiary receiving no business except that given to it by the parent;
(8) The parent using the subsidiary's property as its own;
(9) Whether formal legal requirements were observed;
(10) Whether the directors of one corporation acted in the independent and primary interest of the other;
(11) Whether the two operations were so integrated through the commingling of funds, interactivities and common direction and

supervision that they should be considered as one enterprise;
(12) Whether one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of the other.
The last two factors seem to beg the question, but I have included them for the sake of completeness.

**9.** Indeed, though North Pacific seems to argue to the contrary, corporations must, by definition, be operated in someone's interest. That fact hardly indicates an improper corporate purpose.

dling—as evinced by the $150,000 Hellenic loan—needed the capital of which it had just been divested.

The Louisiana Business Corporation Law provides that:

D. Every shareholder who receives any unlawful dividend or other unlawful distribution of assets shall be liable to the corporation, or to creditors of the corporation, or to both, in an amount not exceeding the amount so received by him.

R.S. 12:93(D). In selling its stock back to Bulkhandling, Hellenic's actions constituted a partial liquidation of Bulkhandling and were an unlawful distribution of assets. Were Bulkcarriers to have bought its stock back from Hellenic after May 18, 1973, the unlawful nature of the distribution would have been evident as a matter of form and substance. As a matter of substance, I have no doubt that Bulkhandling's purchase was equally unlawful.

The facts are clear: Bulkhandling was a successor corporation to Bulkcarriers. Defendants' only argument against this conclusion defies logic, for they contend that since no *legal* steps were taken to consolidate Bulkcarriers into Bulkhandling, Bulkhandling cannot be a successor corporation. Fortunately, the law is not so blind. In the seminal case of *Wolff v. Shreveport Gas Electric Light & Power Co.,* 138 La. 743, 70 So. 789, 794 (1916), the Louisiana Supreme Court cited four general groups of transactions that bring about identity of corporations:

"The first of such groups comprehends consolidations proper, where all the constituent companies cease to exist and a new one comes into being; the second, cases of merger proper, in which one of the corporate parties ceases to exist while the other continues. The third group comprehends cases where a corporation is, either in law or point of fact, the reincarnation of an old one. *To the fourth group belong those transactions whereby a corporation, although continuing to exist de jure, is in fact merged in another, which, by acquiring its assets*

*and business, has left of the other only its corporate shell."* (Emphasis added)

And, it might be noted, its potential liabilities. The Court's statement of Louisiana law was recently reaffirmed in *Roddy v. Norco Local 4–750, Oil, Chemical, Etc.,* 359 So.2d 957 (La.1978), and the "fourth group" describes what transpired between Bulkcarriers and the rest of the Pyramid group, including Bulkhandling, to the letter.

In sum, if Bulkcarriers had been stripped of $188,900 by a stock sale with Hellenic in September of 1973, Hellenic would be liable to plaintiff for that amount. The result can be no different when the money was stripped from two corporations, Bulkhandling and Ventures, which had succeeded to then-defunct Bulkcarriers' assets and business.

## IV. OTHER CONTENTIONS

Plaintiff's second legal theory is that Ventures, Bulkhandling, and Transbulk were successor corporations to Bulkcarriers. I have already found this to be a fact as to Bulkhandling and Transbulk; however, they are not defendants in this lawsuit. As to Ventures, I have found Bulkcarriers to be a "mere instrumentality" of Ventures. Concerning the HANS CHRISTOPHERSON, Ventures was also a successor corporation to Bulkcarriers' business.

Finally, plaintiff seeks relief from the fact that Ventures has paid for all defendants' legal fees. Defendants respond that they will apportion fees at a later date. Without more, I feel it is outside this Court's province to mandate some sort of immediate apportionment and refund at present. Presumably, the matter will be resolved in due course and a proper accounting will be required by the presiding bankruptcy judge.

### C.

### CONCLUSION

Based upon the above findings of fact and conclusions of law, I find Ventures liable for the full amount of the unpaid judgment against Bulkcarriers, $724,809.85.

In addition, to the extent Ventures is unable to pay said amount, I find Hellenic liable in an amount up to $188,900. The plaintiff shall prepare a judgment consistent with this opinion.

APPENDIX: NEXUS

A. Peter Guarisco:
  1. With Hellenic
    (a) Stock owned by Guarisco and family
    (b) Director, January 1, 1969—September 1, 1978
    (c) President, February 21, 1973—September 1, 1978
  2. With Ventures
    (a) Stock ownership ranging between 16.4% and 50%, April 23, 1969—September 1, 1978
    (b) Director, April 1, 1969—September 1, 1978
    (c) Chairman of the Board, June 9, 1970—September 1, 1978
    (d) President, April 1, 1969—June 6, 1970
    (e) Treasurer, April 1, 1969—September 1, 1978
  3. With Bulkcarriers
    (a) Director and Chairman of the Board, July 25, 1969—September 1, 1978
  4. With Bulkhandling
    (a) Director, March 2, 1970—September 1, 1978
    (b) Chairman of the Board, April 15, 1970—September 1, 1978
  5. With Transbulk
    (a) Director, October 5, 1972—September 1, 1978
    (b) Secretary/Treasurer, October 5, 1972—September 1, 1978
B. Donald Scafidi:
  1. With Ventures
    (a) Stock ownership ranging between 30% and 33.6%, March 30, 1971—September 1, 1978
    (b) Director, April 1, 1969—September 1, 1978

    (c) Vice President, April 1, 1969—June 9, 1970
    (d) President, April 6, 1970—September 1, 1978
  2. With Bulkcarriers
    (a) Stock ownership ranging between 4% and 5%, September 30, 1970—September 1, 1978
    (b) Director, July 25, 1969—September 1, 1978
    (c) President, July 25, 1969—September 1, 1978
  3. With Bulkhandling
    (a) Director, March 2, 1970—September 1, 1978
    (b) Secretary/Treasurer, April 15, 1970—September 1, 1978
  4. With Transbulk
    (a) Director, October 5, 1972—September 1, 1978
    (b) President, October 5, 1972—September 1, 1978
C. David Graf:
  1. With Hellenic
    (a) Director, January 1, 1969—September 1, 1978
    (b) Vice President, February 21, 1973—September 1, 1978
  2. With Bulkcarriers
    (a) Director, July 25, 1969—September 1, 1978
    (b) Secretary/Treasurer, July 25, 1969—September 1, 1978
  3. With Bulkhandling
    (a) Director, March 2, 1970—January 29, 1974
    (b) Secretary/Treasurer, April 15, 1970—January 29, 1974
D. Hellenic:
  1. Owned between 50% and 100% of the stock of Bulkcarriers between July 25, 1969 and September 1, 1978.
  2. Owned 100% of the stock of Bulkhandling between March 4, 1970 and September 17, 1973.
E. Ventures:
  1. Owned 100% of the stock of Bulkhandling between September 18, 1973 and September 1, 1978.

2. Owned all of the beneficial interest in the stock of Transbulk between October 9, 1972 and September 1, 1978.

F. Trusts for Peter Guarisco's children owned between 29.4% and 49% of the stock of Ventures between August 7, 1970 and September 1, 1978.